**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
KRISTEN SIMPLICIO (State Bar No. 263291)
ANTHONY PATEK (State Bar No. 228964)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469
adam@gutridesafier.com
seth@gutridesafier.com
kristen@gutridesafier.com
anthony@gutridesafier.com

Attorneys for *Plaintiffs in-Intervention*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACKIE FITZHENRY-RUSSELL, on behalf of herself, the general public and those similarly situated,<br><br>    Plaintiff,<br><br>        v.<br><br>THE COCA COLA COMPANY,<br><br>    Defendant. | CASE NO. 5:17-CV-00603-EJD<br><br>**DECLARATION OF SETH A. SAFIER IN SUPPORT OF PLAINTIFFS-IN-INTERVENTION'S  MOTION TO INTERVENE AND PLAINTIFF'S MOTION FOR LEAVE TO AMEND**<br><br>Hon. Edward J. Davila<br><br>May 16, 2019 at 9:00 a.m.<br><br>San Jose Courthouse, Courtroom 4 - 5th Floor |

1

I, Seth A. Safier, declare:

1.      I am an attorney licensed to practice before this Court.  I am a partner in Gutride Safier LLP, counsel for plaintiff in this action. I make this declaration of my own personal knowledge, and if called to testify, I could and would competently testify hereto under oath.

2.      Attached hereto as Exhibit 1 is a true and correct copy of a proposed second amended complaint in this action.

3.      Attached hereto as Exhibit 2 is a true and correct copy of redline comparing the proposed second amended complaint to the first amended complaint in this action.

4.      Attached hereto as Exhibit 3 is a true and correct copy of uncorrected testimony from Plaintiff Fitzhenry Russell.

Executed this 29th day of January, 2019, at San Francisco, California.  I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


_____/s/ Seth A. Safier_____
Seth A. Safier

DECLARATION OF SETH A. SAFIER IN SUPPORT OF REPLY MEMORANDUM **Error! Unknown document property name.**

DECLARATION OF SETH A. SAFIER ISO MOTIONS TO INTERVENE AND AMEND

# Exhibit 1

**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
MARIE A. MCCRARY (State Bar No. 262670)
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 271-6469
Facsimile:  (415) 449-6469

MATTHEW T. MCCRARY (admitted *pro hac vice*)
265 Franklin St, Suite 1702
Boston, MA 02110
Telephone: (214) 502-2171

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACKIE FITZHENRY-RUSSELL, DAVID SWARTZ, ASHLEY SALCEDO, SCOTT MILLER, ISABELO PASCUAL,  FLORIN CARLIN, and KRISTINA HOFFMAN, on behalf of themselves, the general public and those similarly situated,<br><br>        Plaintiff,<br><br>               v.<br><br>THE COCA COLA COMPANY, and DOES 1-50,<br><br>        Defendants. | CASE NO. 5:17-CV-00603-EJD<br><br>UNLIMITED CIVIL CASE<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE CONSUMER PROTECTION ACTS OF 50 STATES AND THE DISTRICT OF COLUMBIA; FRAUD, DECEIT, AND/OR MISREPRESENTATION; VIOLATION OF CALIFORNIA'S FALSE ADVERTISING AND UNFAIR COMPETITION LAWS**<br><br>JURY TRIAL DEMANDED |

**INTRODUCTION**

1.      Plaintiffs Jackie Fitzhenry-Russell, David Swartz, Ashley Salcedo, Scott Miller, Isabelo Pascual, Florin Carlin, and Kristina Hoffman, by and through their counsel, bring this class action against Defendants The Coca Cola Company and Does 1-50, inclusive, on behalf of themselves, the general public, and those similarly situated, for violations of the Consumer Protection Acts of all 50 states and the District of Columbia; common law fraud, deceit, and/or misrepresentation; violations of California's False Advertising Law; and violation of California's Unfair Competition Law.  The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

2.      This case concerns Defendants' false and deceptive labeling, advertising, marketing, and sale of all Seagram's brand ginger ales labeled as "Made with Real Ginger" ("Seagram's or the "Products").[1] This representation leads consumers to reasonably believe that Defendants' soft drink is made with, and contains, real ginger root—not chemically derived extracts of the ginger plant—and that consumers who drink the soft drink will receive the health benefits associated with consuming real ginger root. Indeed, consumer surveys demonstrate that more than 75% of people believe a drink claiming to be "Made with Real Ginger" is made using actual ginger root and ***not*** extracts. Further consumer research demonstrates that when a marketer claims its product is made with an ingredient that is widely known to be healthy—such as ginger root, which has long been perceived as a natural remedy—then consumers will reasonably infer that the product is a healthier alternative to products that are not made with the ingredient.

3.      In truth, Defendants' soft drink is not made with real ginger root. Instead, Seagram's Ginger Ale is made with carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavors," i.e., a flavor compound that is manufactured in a laboratory-setting using various chemicals and extraction processes. Although the flavor compound contains a miniscule amount of ginger flavor extract, reasonable consumers expect the drink to be made

---
[1] These include at least the following: Seagram's Ginger Ale; Seagram's Diet Ginger Ale; Seagram's Ginger Ale, 25% Fewer Calories; Seagram's Raspberry Ginger Ale; Seagram's Diet Raspberry Ginger Ale.

with ginger root, not a ginger flavor extract because the product states it is "Made with Real Ginger." Further, the miniscule amount of flavor extract comprises barely ***three parts per million*** of the final beverage. When a manufacturer claims a product is "made with" a particular ingredient, reasonable consumers expect the product to be a "good source" of that ingredient. Here, that would require there to be enough "real ginger" to provide the health benefits consumers associate with the ingredient, or at least to impart a ginger flavor to the beverage. This microscopic amount of ginger flavor extract does neither. It provides none of the health benefits consumers associate with real ginger and even appears to fall below the threshold concentration at which the average consumer can perceive a "ginger" flavor, requiring the addition of other flavors to mimic or enhance the perceptibility of "ginger."[2] Defendants' product labels never disclose that the ginger ale is made with a miniscule amount of a flavor compound manufactured to mimic the taste of real ginger root, rather than with real ginger root.

4.      Throughout the Class Period, Defendants prominently made the claim "Made with Real Ginger" on the front label panel of all of its Seagram's Ginger Ale cans and bottles, cultivating a wholesome and healthful image in an effort to promote the sale of its soft drink and to compete with small batch ginger ales that are made with real ginger root. Consumers rely on and value the representation "Made with Real Ginger" because studies have found that real ginger root has health benefits when consumed. The "Made with Real Ginger" claim caused consumers to pay a price premium of at least 6% of the purchase price.

## PARTIES

5.      Jackie Fitzhenry-Russell is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Santa Cruz, California.

6.      David Swartz is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Berkeley, California.

7.      Ashley Salcedo is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Harrisburg, Pennsylvania.

_____

[2] *See* Fisher, C. and Scott T., *Food Flavours Biology and Chemistry* (1997) (noting that the threshold concentration for tasting ginger compounds is between 7 and 17 parts per million).

1   8.      Scott Miller is, and at all times alleged in this Class Action Complaint was, an

2   individual and a resident of Auburndale, Florida.

3   9.      Isabelo Pascual is, and at all times alleged in this Class Action Complaint was, an

4   individual and a resident of Los Angeles, California.

5   10.     Florin Carlin is, and at all times alleged in this Class Action Complaint was, an

6   individual and a resident of St. Petersburg, Florida.

7   11.     Kristina Hoffman is, and at all times alleged in this Class Action Complaint was,

8   an individual and a resident of Medford, New Jersey.

9   12.     Defendant The Coca Cola Company is a corporation existing under the laws of the

10   State of Delaware, having its principal place of business in Atlanta, Georgia.

11   13.     The true names and capacities of Defendants sued as Does 1 through 50, inclusive,

12   are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names pursuant to

13   section 474 of the California Code of Civil Procedure.  Plaintiff will seek leave of Court to amend

14   this Class Action Complaint when said true names and capacities have been ascertained.

15   14.     The Parties identified in paragraphs 13-14 of this Class Action Complaint are

16   collectively referred to hereafter as "Defendants."

17   15.     At all times herein mentioned, each of the Defendants was the agent, servant,

18   representative, officer, director, partner or employee of the other Defendants and, in doing the

19   things herein alleged, was acting within the scope and course of his/her/its authority as such

20   agent, servant, representative, officer, director, partner or employee, and with the permission and

21   consent of each Defendant.

22   16.     At all times herein mentioned, each of the Defendants was a member of, and

23   engaged in, a joint venture, partnership and common enterprise, and acted within the course and

24   scope of, and in pursuance of, said joint venture, partnership and common enterprise.

25   17.     At all times herein mentioned, the acts and omissions of each of the Defendants

26   concurred and contributed to the various acts and omissions of each and all of the other

27   Defendants in proximately causing the injuries and damages as herein alleged.

28   18.     At all times herein mentioned, each of the Defendants ratified each and every act

or omission complained of herein.

19.    At all times herein mentioned, each of the Defendants aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## JURISDICTION AND VENUE

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). Defendant averred on removal that the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this action is a class action in which at least one member of the class is a citizen of a State different from the Defendants.

21.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California.  Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

23.    In accordance with California Civil Code Section 1780(d), Plaintiff concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased Seagram's Ginger Ale in Santa Cruz, California and Capitola, California.  (Plaintiff's declaration is attached hereto as Exhibit A.)

24.    Plaintiffs accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

**Defendants' Ginger Ales.**

25.    Defendants manufacture, distribute, market, advertise, and sell soft drinks in the United States under several brand names, including "Seagram's." Defendants' packaging for the Seagram's Ginger Ale predominately, uniformly, and consistently state on the principal display

panel of the product labels that it is "Made with Real Ginger".

26.     The representation that the Product is "Made with Real Ginger" was uniformly communicated to Plaintiffs and every other person who purchased any of the Products. An exemplar the Product's product label is attached hereto as Exhibit B.  The same or substantially similar product label has appeared on each bottle or can sold (as those shown in Exhibit B) during the entirety of the Class Period.

27.     As described in detail below, Defendants' advertising and labeling of the Product, as made with "Real Ginger" is false, misleading, and intended to induce consumers to purchase the ginger ales, at a premium price, while ultimately failing to meet consumer expectations. These representations deceive and mislead reasonable consumers into believing that the Product is made with, and contains, real ginger root—not chemically derived extracts of the ginger plant—and that consumers who drink the soft drink will receive the health benefits associated with consuming real ginger root. Indeed, consumer surveys demonstrate that more than 75% of people believe a drink claiming to be "Made with Real Ginger" is made using actual ginger root and ***not*** extracts. Further consumer research demonstrates that when a marketer claims its product is made with an ingredient that is widely known to be healthy—such as ginger root, which has long been perceived as a natural remedy—then consumers will reasonably infer that the product is a healthier alternative to products that are not made with the ingredient.

28.     In fact, the Product is not made with real ginger. Instead, Seagram's is made with carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavors," i.e., a flavor compound that is manufactured in a laboratory-setting using various chemicals and extraction processes. Although the flavor compound contains a miniscule amount of ginger flavor extract, reasonable consumers expect the drink to be made with ginger root, not a ginger flavor extract because the product states it is "Made with Real Ginger." Further, the miniscule amount of flavor extract comprises barely ***three parts per million*** of the final beverage.

29.     When a manufacturer claims a product is "made with" a particular ingredient, reasonable consumers expect the product to be a "good source" of that ingredient.  Here, that would require there to be enough "real ginger" to provide the health benefits consumers associate

with the ingredient, or at least to impart a ginger flavor to the beverage. This microscopic amount of ginger flavor extract does neither. It provides none of the health benefits consumers associate with real ginger and even appears to fall below the threshold concentration at which the average consumer can perceive a "ginger" flavor, requiring the addition of other flavors to mimic or enhance the perceptibility of "ginger."

**Consumer Demand for Real Ginger**

30.     Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely take nutrition information into consideration in selecting and purchasing food items. Product package labels convey nutrition information to consumers that they use to make purchasing decisions. As noted by FDA commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Consumers attribute a myriad of benefits to ginger and foods made with real ginger root.

31.     Ginger root has been used for thousands of years for the treatment of numerous ailments, such as colds, nausea, arthritis, migraines, and hypertension. Scientific studies have confirmed that ginger has anti-inflammatory effects and aids in relaxing muscles, is effective in alleviating symptoms of nausea and vomiting, has anti-carcinogenic qualities, and appears to reduce cholesterol and improve lipid metabolism, thereby helping to decrease the risk of cardiovascular disease and diabetes. The benefits of consuming ginger have been widely publicized to consumers in the United States in recent years.

**Federal and State Regulations Governing Food Labeling**

32.     The Food and Drug Administration has defined "natural flavor" to mean "the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy Product, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional." 21 C.F.R. 501.22(a)(3). In

other words, a "natural flavor" is one that contains some oil, protein, or essence from a plant or animal. But it bears little resemblance to the actual plant or animal from which it is derived. Rather, natural flavors are made in a laboratory by scientists who make determinations on how to replicate a flavor using chemicals found in nature.

33.     While it may be that ginger root is used in the creation of the natural flavor, it is not ginger as a reasonable consumer would understand it. Rather, the scientists that created the "natural flavor" added to the Product would have isolated proteins from the cells and tissue of the ginger root or extracted oils or essences from the ginger root. But because those isolated compounds may not actually taste like ginger, the scientist would have then combined those extractions with any number of other extractions from other plants and animals to create a flavoring substance that tastes like ginger. *See* https://www.scientificamerican.com/article/what-is-the-difference-be-2002-07-29/ (describing the process for creating natural flavors) (last accessed October 21, 2016).

34.     Identical federal and California laws regulate the content of labels on packaged food and require truthful, accurate information on the labels of packaged foods. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. §§ 101 and 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food Product. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

35.     Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if "its labeling is false or misleading in any particular," or if it does not contain certain information on its label or in its labeling. California Health & Safety Code § 110660; 21 U.S.C. § 343(a).

36.     Under the FDCA, the term *false* has its usual meaning of "untruthful," while the term ***misleading*** is a term of art that covers labels that are technically true, but are likely to

deceive consumers. Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

37.     Further in addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations. *See* California Health & Safety Code § 110660 (misbranded if label is false and misleading); California Health & Safety Code § 110705 (misbranded if words, statements and other information required by the Sherman Law are either missing or not sufficiently conspicuous); and California Health & Safety Code § 110740 (misbranded if contains artificial flavoring, artificial coloring and chemical preservatives but fails to adequately disclose that fact on label).

38.     Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded Product has no economic value and are legally worthless.

39.     Representing that a soft drink is made with "real ginger" is a statement of fact, and use of this phrase on the labels of packaged food is limited by the aforementioned misbranding laws and regulations.

**Defendants' Marketing and Labeling of its Ginger Ales Violates State and Federal Food Labeling Laws**

40.     The Product is unlawful, misbranded and violates the Sherman Law, California Health & Safety Code § 110660, *et seq.*, because the Product's labels include the phrase "Made with Real Ginger," even though they are not made using real ginger. Instead, the Product is made with a complex flavoring compound (i.e., "natural flavors") that is manufactured in a laboratory-setting using various chemicals and extraction processes and designed to mimic the taste of ginger. Although the flavor compound contains a miniscule amount of ginger flavor extract, reasonable consumers expect the drink to be made with ginger root, not a ginger flavor extract because the product states it is "Made with Real Ginger." They also expect the beverage to be a good source of "real ginger" since Defendants highlighted that the beverage was "made

with" that ingredient. In truth, the miniscule amount of flavor extract Defendants use to make Seagram's comprises barely ***three parts per million*** of the final beverage. Seagram's is not made with, and does not contain, real ginger as a reasonable consumer would understand it, nor does it provide any of the health benefits that would be obtained if real ginger root were used or present. The microscopic amount of flavor extract even appears to fall below the threshold concentration at which the average consumer can perceive a "ginger" flavor, requiring the addition of other flavors to mimic or enhance the perceptibility of "ginger."

41.     Defendants' marketing, advertising, and sale of the Product violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including but not limited to:

a.  Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

b.  Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

c.  Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

42.     Defendants' marketing, advertising, and sale of the Product violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

d.  Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

e.  Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

f.  Section 110740 (a food is misbranded if it contains artificial flavoring, artificial

coloring and chemical preservatives but fail to adequately disclose that fact on their labeling);

g. Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

h. Section 110765, which makes it unlawful for any person to misbrand any food; and

i. Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

43.     Defendants have violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including but not limited to 21 C.F.R. §§ 101.3, 101.13, 101.14, 101.22, and 101.65 which have been incorporated by reference in the Sherman Law, by failing to include on their product labels the nutritional information required by law.

**Defendants' Marketing and Labeling of its Ginger Ales is False, Deceptive and Misleading**

44.     A reasonable consumer would expect that the Products contain what Defendants identifies them to contain on the product labels. A reasonable consumer would expect that when Defendants label the Product as being "Made with Real Ginger," the soft drinks are made with, and contain, real ginger, i.e., ginger root, and not chemically-derived flavor extracts.

45.     Moreover, Defendants do not disclose on the product labels that the Product is flavored with a chemical compound that was manufactured to mimic the flavor of ginger. Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendants' food labeling claims, especially at the point of sale. Consumers would not know the true nature of the ginger flavoring merely by reading the ingredient label; its discovery requires investigation beyond the grocery store and knowledge of food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that the ginger flavor in the soft drink is not from the presence of real ginger in the soft drink but instead comes from a flavor compound manufactured to make the drink taste like ginger. That, combined with Defendants' active concealment in representing the Product as being "Made with Real Ginger," and not disclosing otherwise, gave the average reasonable consumer

no reason to suspect that Defendants' representations on the packages were not true, and therefore consumers had no reason to investigate whether the soft drinks contained real ginger.  Thus, reasonable consumers relied on Defendants' representations regarding the nature of the Products. Such reliance by consumers is also eminently reasonable, since food companies are prohibited from making false or misleading statements on their products under federal law.

46.     Defendants intend and know that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendants have done with the "Made with Real Ginger" claim.

**Defendants' Website and Other Marketing Confirms That Defendants Intends to Deceive Consumers**

47.     Defendants' own long standing advertising and marketing materials show that Defendants intended to deceive consumers into believing the false and deceptive packaging of the Product.

48.     Defendants' advertising campaign typically shows a picture of the bottle or can of the Product, where the words "Made with Real Ginger" Are prominently featured. The can with those words appears both on Defendants' websites and in a variety of print advertisements.

49.     Defendants also permit and encourage their marketing partners, including grocery stores, to advertise, market, advertise and sell the Product as a soft drink "Made with Real Ginger." Defendants provide their marketing partners information, including posters, signs, end cap displays, etc., that specifically represent that the Product is "Made with Real Ginger." Further, in sales sheets, sales presentations, and other marketing materials, Defendants state that the Product is "Made with Real Ginger."

50.     In short, Defendants' advertising and marketing campaign confirms that Defendants intend to deceive consumers through misrepresentations on the Product's product labels.  More specifically, Defendants intend that consumers who read the Product's labels believe that the Product is made with, and contains, real ginger, i.e., ginger root, and not chemically-derived flavor extracts.

**Defendants' Employ Misleading Marketing Their Ginger Ales To Increase Profits and Gain a Competitive Edge**

51.     Defendants do not use real ginger in their Product as doing so is more expensive than using flavoring compound. In recent years, numerous studies have found the presence of lead in ginger, and manufacturers and retailers of other products containing ginger root, such as cookies and candies, have been sued by the California Attorney General. Thus, the diligent sourcing and testing procedures that would be required when using real ginger to ensure the product they sell is safe are more expensive to adopt than simply using "natural flavor." In addition, the cost of real ginger has increased in recent years, due to changes in weather in China, which produces 75% of the world's ginger. *See* http://www.producenews.com/news-dep-menu/test-featured/9579-ginger-prices-skyrocket-on-shrinking-supply (last accessed October 21, 2016).

52.     In the last decade, in response to news reports about the dangers of high fructose corn syrup and soda's role in contributing to the increased rates of obesity and diabetes in this country, many consumers are drinking less soda, and are seeking out instead, healthier beverages, like iced teas and flavored waters. *See* http://www.nytimes.com/2015/10/04/upshot/soda-industry-struggles-as-consumer-tastes-change.html?_r=0 (last accessed October 21, 2016). And while soda sales are declining, one segment of the category is on the rise – small companies and brands that emphasize their use of natural ingredients, such as Reed's, Bruce Cost, Maine Root, and Grown Up Soda. In 2014, the Specialty Food Association noted that healthy beverages were growing in popularity, as was the market for more sophisticated, specialty sodas containing all natural ingredients. *See* https://www.specialtyfood.com/news/article/rise-healthy-beverages/ (last accessed October 21, 2016). Thus, many small craft soda companies are flourishing in response to increased consumer demand for alternatives to sodas made with high fructose corn syrup, artificial ingredients, and preservatives. Facing a public hostile to "Big Soda" and finding its sales dwindling due to the newer, healthier brands, Defendants have an incentive to emphasize the presence of ginger in the Product to appeal to consumers seeking real ingredients instead of a traditional soda.

53.     In making the false, misleading, and deceptive representations, Defendants

distinguish their ginger ales from their competitors' Product. Defendants knew and intended that consumers would purchase, and pay a premium for, ginger ales labeled as being made with "Real Ginger," over comparable ginger ales that do not contain these representations on the product labels. By using this branding strategy, Defendants are stating that their ginger ales are superior to, better than, and more nutritious and healthful than other brands of ginger ales that do not proclaim to be made with "Real Ginger." For example, other brands of ginger ales that do not contain the false, misleading, and deceptive representation that they are made with "Real Ginger," include brands such as Dr. Brown's and Vernors.

54.     Further, Defendants knew and intended their representations to help them compete with small batch bottling companies that do make ginger ales using real ginger root. Defendants added the "Made with Real Ginger" representation to their product labels to compete with such small batch bottling companies that have increased in popularity in recent years. For example, Bruce Cost Ginger Ale is made with fresh whole ginger root and represents this fact to consumers in its advertising and on its product packaging. Likewise Reed's is brewed using ginger root and represents this fact to consumer on its label.

55.     Because consumers pay a price premium for products made with real ginger, by labeling their products as containing real ginger without actually using the expensive ingredient, Defendants are able to both increase their sales and retain more in profits. Studies have shown that the "Made with Real Ginger" representation caused consumers to pay a premium of at least 6% of the purchase price for the Products.

56.     Defendants engaged in the practices complained of herein to further their private interests of: (i) increasing sales of their ginger ales, while decreasing the sales of ginger ales that do not claim to be made with real ginger and those ginger ales that are truthfully offered as made with real ginger by Defendants' competitors, and/or (ii) commanding a higher price for their ginger ales because consumers will pay more for these soft drinks due to the consumers' demand for products containing real ginger because of the perceived benefits.

**Defendants Intend to Continue To Market Beverages as Being Made with "Real Ginger" that Do Not Contain Ginger.**

57.     Because of the growing market described above and because Defendants know consumers rely on representations about the presence of real ginger in beverages, Defendants have an incentive to continue to make such false representations. In addition, other trends suggest that Defendants have no incentive to change their labeling practices.

58.     For example, ginger ale is a particularly strong growing flavor in the healthy soda category. In December 2015, a brand manager for a competing brand, Schweppes, described ginger as a "growing flavor trend." *See* http://www.prnewswire.com/news-releases/schweppes-introduces-new-dark-ginger-ale-packed-with-a-refreshing-bolder-taste-300188635.html.

59.     Defendants are also likely seeking to diversify their beverage portfolio in response to the changing market, the booming craft soda market, and the decreased demand for traditional sodas from big manufacturers. Defendants, who have in the past acquired smaller companies that compete with their bigger brands (e.g. acquiring Blue Sky despite selling sodas under the Coca Cola and Sprite brand names), will likely desire to do the same to maintain their competitive edge and ensure they are offering ginger ales at all segments of the market.

## PLAINTIFFS' EXPERIENCES

**Plaintiff Fitzhenry-Russell's Experiences**

60.     Plaintiff Fitzhenry-Russell made several purchases of the Product from Safeway, located in Santa Cruz, CA, and a Lucky, located in Capitola, CA. She made each of her purchases of the Product after reading and relying on the truthfulness of Defendants' product label that promised that the Products were "Made with Real Ginger." Ms. Fitzhenry-Russell believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. Ms. Fitzhenry-Russell has long known that ginger root is a natural remedy, and that it can soothe an upset stomach and reduce inflammation. She believed that a product claiming to be "Made with Real Ginger" would contain enough ginger to provide the health benefits she associated with real ginger.

61.     At the time of each purchase of Seagram's, Ms. Fitzhenry-Russell did not know that the Products she purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of

real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Ms. Fitzhenry-Russell. As a result of Defendants' misrepresentations and omissions, Ms. Fitzhenry-Russell was injured by paying more money for Seagram's than she would have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Ms. Fitzhenry-Russell would not have purchased Seagram's or would have paid a lower price for it.

62.     Ms. Fitzhenry-Russell continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Ms. Fitzhenry-Russell would likely purchase Defendants' Products again in the future. Ms. Fitzhenry-Russell regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Ms. Fitzhenry-Russell does not know the formula for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Ms. Fitzhenry-Russell will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products with the phrase "Made with Real Ginger" unless the product is actually made with ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Ms. Fitzhenry-Russell cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Ms. Fitzhenry-Russell is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Ms. Fitzhenry-Russell could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

**Plaintiff David Swartz's Experiences**

63.     Plaintiff David Swartz frequently purchased the Products in California during the class period. He made each of his purchases of the Product after reading and relying on the truthfulness of Defendants' product label that promised that the Products were "Made with Real Ginger." Mr. Swartz believed this meant that Seagram's was made with ginger root and was, as a

result, a healthier alternative to regular sodas. Mr. Swartz purchased Seagram's ginger ale because he believed that the real ginger in the beverage helped him and other persons in his family with stomach related issues. He believed that a product claiming to be "Made with Real Ginger" would contain enough ginger to provide the health benefits he associated with real ginger.

64.     At the time of each purchase of Seagram's, Mr. Swartz did not know that the Products he purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Mr. Swartz. As a result of Defendants' misrepresentations and omissions, Mr. Swartz was injured by paying more money for Seagram's than he would have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Mr. Swartz would not have purchased Seagram's or would have paid a lower price for it.

65.     Mr. Swartz continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Mr. Swartz would likely purchase Defendants' Products again in the future. Mr. Swartz regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Mr. Swartz does not know the formula for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Mr. Swartz will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products with the phrase "Made with Real Ginger" unless the product is actually made with ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Mr. Swartz cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Mr. Swartz is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Mr. Swartz could be at risk for buying another one of Defendants'

Products in reliance on the same or similar misrepresentation.

**Plaintiff Salcedo's Experiences**

66.     Plaintiff Salcedo has purchased Seagram's for years at her local Walmart, and in other nearby stores in Harrisburg, Pennsylvania. She made each of her purchases of the Product after reading and relying on the truthfulness of Defendants' product label that promised that the Products were "Made with Real Ginger." Ms. Salcedo believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. Ms. Salcedo specifically purchased the Seagram's ginger ale for the health properties of ginger, i.e., helping with stomach flu, cold, nausea, anti-inflammation, and digestive regulation.  She believed that a product claiming to be "Made with Real Ginger" would contain enough ginger to provide the health benefits she associated with real ginger.

67.     At the time of each purchase of Seagram's, Ms. Salcedo did not know that the Products she purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Ms. Salcedo. As a result of Defendants' misrepresentations and omissions, Ms. Salcedo was injured by paying more money for Seagram's than she would have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Ms. Salcedo would not have purchased Seagram's or would have paid a lower price for it.

68.     Ms. Salcedo continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Ms. Salcedo would likely purchase Defendants' Products again in the future. Ms. Salcedo regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Ms. Salcedo does not know the formula for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Ms. Salcedo will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products with the phrase "Made with Real Ginger" unless the product is actually made with

ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Ms. Salcedo cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Ms. Salcedo is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Ms. Salcedo could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

**Plaintiff Miller's Experiences**

69.     Plaintiff Scott Miller was purchasing Seagram's ginger ale every month until early 2015. He made each of his purchases of the Product after reading and relying on the truthfulness of Defendants' product label that promised that the Products were "Made with Real Ginger." Mr. Miller believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. Mr. Miller stopped purchasing Seagram's in early 2015 after he tried Fever Tree ginger ale, which made him question the veracity of Defendant's "Made with Real Ginger" representation.

70.     At the time of each purchase of Seagram's, Mr. Miller did not know that the Products he purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Mr. Miller. As a result of Defendants' misrepresentations and omissions, Mr. Miller was injured by paying more money for Seagram's than he would have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Mr. Miller would not have purchased Seagram's or would have paid a lower price for it.

71.     Mr. Miller continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Mr. Miller would likely purchase Defendants' Products again in the future. Mr. Miller regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Mr. Miller does not know the formula

for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Mr. Miller will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products with the phrase "Made with Real Ginger" unless the product is actually made with ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Mr. Miller cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Mr. Miller is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Mr. Miller could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

**Plaintiff Pascual's Experiences**

72.     Plaintiff Isabelo Pascual frequently purchased two liter bottles of Seagram's from Ralph's grocery stores and 7-11 convenience stores in California during the class period. He made each of his purchases of the Product after reading and relying on the truthfulness of Defendants' product label that promised that the Products were "Made with Real Ginger." Mr. Pascual believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. He believed that a product claiming to be "Made with Real Ginger" would contain enough ginger to provide the health benefits he associated with real ginger.

73.     At the time of each purchase of Seagram's, Mr. Pascual did not know that the Products he purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Mr. Pascual. As a result of Defendants' misrepresentations and omissions, Mr. Pascual was injured by paying more money for Seagram's than he would have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Mr. Pascual would not have purchased Seagram's or would have paid a lower price for it.

74.     Mr. Pascual continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Mr. Pascual would likely purchase Defendants' Products again in the future. Mr. Pascual regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Mr. Pascual does not know the formula for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Mr. Pascual will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products with the phrase "Made with Real Ginger" unless the product is actually made with ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Mr. Pascual cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Mr. Pascual is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Mr. Pascual could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

75.

**Plaintiff Carlin's Experiences**

76.     Plaintiff Carlin purchased Seagram's ginger ale approximately every two weeks from the Publix grocery store in her neighborhood in Florida for the past two years. Prior to that, she would occasionally purchase Seagram's ginger ale.  About two years ago, she switched from other carbonated soft drinks to Seagram's because of the "Made with Real Ginger" representation. Ms. Carlin believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. She bought Seagram's for the anti-inflammatory and stomach calming benefits associated with ingesting real ginger root. Ms. Carlin believed that a product claiming to be "Made with Real Ginger" would contain enough ginger to provide the health benefits she associated with real ginger. However, she stopped purchasing Seagram's recently when she learned the truth of the matter from news reports about litigation

involving Canada Dry ginger ale.

77.     At the time of each purchase of Seagram's, Ms. Carlin did not know that the Products she purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Ms. Carlin. As a result of Defendants' misrepresentations and omissions, Ms. Carlin was injured by paying more money for Seagram's than she would have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Ms. Carlin would not have purchased Seagram's or would have paid a lower price for it.

78.     Ms. Carlin continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Ms. Carlin would likely purchase Defendants' Products again in the future. Ms. Carlin regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Ms. Carlin does not know the formula for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Ms. Carlin will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products with the phrase "Made with Real Ginger" unless the product is actually made with ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Ms. Carlin cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Ms. Carlin is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Ms. Carlin could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

**Plaintiff Hoffman's Experiences**

79.     Plaintiff Hoffman purchased Seagram's ginger ale approximately every two weeks from the from the Acme and the Shoprite groceries stores in her neighborhood since she moved to

New Jersey a few years ago. She typically, but not exclusively, purchased the screw top bottle format, as opposed to cans.  Before that time, she would occasionally purchase Seagram's ginger ale, among other ginger ales.  Shortly after she returned to New Jersey from California a few years ago, she switched from other carbonated soft drinks to Seagram's because of the "Made with Real Ginger" representation. Ms. Hoffman believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. She bought Seagram's for herself and for her two young daughters based upon the anti-inflammatory and stomach calming benefits associated with ingesting real ginger root. Ms. Hoffman believed that a product claiming to be "Made with Real Ginger" would contain enough ginger to provide the health benefits she associated with real ginger. However, she stopped purchasing Seagram's recently when she learned the truth of the matter from news reports about litigation involving Canada Dry ginger ale.

80.     At the time of each purchase of Seagram's, Ms. Hoffman did not know that the Products she purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Ms. Hoffman. As a result of Defendants' misrepresentations and omissions, Ms. Hoffman was injured by paying more money for Seagram's than she would have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Ms. Hoffman would not have purchased Seagram's or would have paid a lower price for it.

81.     Ms. Hoffman continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Ms. Hoffman would likely purchase Defendants' Products again in the future. Ms. Hoffman regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Ms. Hoffman does not know the formula for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Ms. Hoffman will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling

its Products with the phrase "Made with Real Ginger" unless the product is actually made with ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Ms. Hoffman cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Ms. Hoffman is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Ms. Hoffman could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

## CLASS ALLEGATIONS

82.     Plaintiff brings this action against Defendants, on behalf of herself and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> All persons who, between December 23, 2012 and the present, purchased any of the Defendants' Product (the "Nationwide Class").

83.     Plaintiffs also seek certification of the following subclass: all members of the Nationwide Class who made their purchases in Alabama, Arizona, California, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Vermont, Washington, West Virginia, or Wyoming (the "Consumer Unfairness/Unlawfulness Subclass").

84.     Plaintiffs Fitzhenry-Russell, Swartz, and Pascual also seek to represent a subclass of those members of the Nationwide Class who purchased any of Defendants' Products in California (the "California Subclass").

85.     Plaintiff Salcedo also seeks to represent a subclass of those members of the Nationwide Class who purchased any of Defendants' Products in Pennsylvania (the "Pennsylvania Subclass").

86.

87.     Plaintiff Hoffman also seeks to represent a subclass of those members of the

Nationwide Class who purchased any of Defendants' Products in New Jersey (the "New Jersey Subclass").

88.     Plaintiffs Miller and Carlin also seek to represent a subclass of those members of the Nationwide Class who purchased any of Defendants' Products in Florida (the "Florida Subclass").

89.     The Nationwide Class, as well as the Subclasses are referred to collectively as the "Classes."

90.     Plaintiffs reserve the right to propose additional or further subclasses or narrowing of the above class and subclass definitions, based on the evidence adduced in discovery, or as necessary and appropriate.

91.     In each of the causes of action pled below, a statement that the count is alleged on behalf of a particular class or subclass includes all subclasses thereof, including subclasses that may later be proposed as described in the prior paragraph.

92.     Plaintiffs and members of the Classes have been economically damaged by their purchase of Seagram's because the advertising for Seagram's was and is untrue and/or misleading under applicable law; therefore, Seagram's is worth less than what Plaintiffs and members of the Classes paid for it and/or Plaintiff and members of the Classes did not receive what they reasonably intended to receive.

93.     As a direct and proximate result of Defendants' unfair and wrongful conduct, as set forth herein, Plaintiffs and class members: (1) were misled into purchasing Seagram's; (2) received a product that failed to meet their reasonable expectations and Defendants' promises; (3) paid a premium sum of money for a product that was not as represented and, thus, were deprived of the benefit of the bargain because the purchased ginger ale had less value than what was represented by Defendants; and (4) ingested a substance that was other than what was represented by Defendants and that Plaintiff and class members did not expect.

94.     This action is properly brought and may be maintained as a class action because it satisfies all of the prerequisites of Rule 23.

95.     <u>Numerosity</u>:  Plaintiffs do not know the exact size the Classes, but they far exceed

-24-

100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

96.     Typicality: Named Plaintiffs are all typical of the Classes because they were subject to the same fraudulent scheme of Defendants as every other class member. They purchased Seagram's based on Defendants' false representation that it was "Made from Real Ginger." They, like all other class members, paid a premium as a result of that misrepresentation and suffered economic injury as a result. Thus, Plaintiffs and the class members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law.  The injuries and damages of each class member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

97.     Adequacy:  Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain.  Plaintiffs have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the class. By prevailing on their own claims, Plaintiffs will establish Defendants' liability to all class members.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

98.     Commonality and Predominance: This action involves common questions the common answers of which will drive the resolution of this case for all class members because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that Seagram's was made using ginger root. Defendants' product label was the same on all Seagram's products throughout the class period. Its formula likewise remained unchanged. Thus, all of the central issues in this case will be resolved via

common proof for all class members, establishing that common issues predominate over any individual issues. The questions of law and fact common to the Classes are:

a)   whether the Product is "Made with Real Ginger;"

b)   whether Defendants unfairly, unlawfully and/or deceptively misrepresented that the Product is "Made with Real Ginger;"

c)   whether the use of the phrase "Made with Real Ginger" on the primary display panel of the Product violated Federal and/or California state law;

d)   whether the advertising of the product as Made with Real Ginger causes it to command a premium in the market as compared with similar products that do not make such a claim;

e)   whether Defendants' advertising and marketing regarding the Product sold to the class members was likely to deceive the class members and/or was unfair;

f)   Whether a "Made with Real Ginger" claim on product packaging and advertising is material to a reasonable consumer;

g)   whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

h)   the amount of profits and revenues earned by Defendants as a result of the conduct;

i)   whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j)   whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

99.   Superiority:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendants and result in the

impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

100.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

### PLAINTIFFS' FIRST CAUSE OF ACTION
*(Violation of the Consumer Protection Acts of 50 States and the District of Columbia, Including, without limitation, the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, et seq.)*
**On Behalf of the Nationwide Class**

101.    Plaintiffs reallege and incorporates the above paragraphs of this Complaint as if fully set forth herein.

102.    Plaintiffs bring this claim on behalf of the Classes for violation of the consumer protection acts of each of the States of the United States, and the District of Columbia.

103.    Plaintiffs bring these statutory consumer protection claims pursuant to the substantially similar "Consumer Protection Acts" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices.

104.    The following consumer protection acts are collectively referred to herein as the

"Consumer Protection Acts":

     a.     ALA. CODE § 8-19-1 et seq. (Alabama);

     b.     ALASKA STAT. ANN. § 45.50.471 et seq. (Alaska);

     c.     ARIZ. REV. STAT. ANN. § 44-1521 et seq. (Arizona);

     d.     ARK. CODE ANN. § 4-88-101 et seq. (Arkansas);

     e.     CAL. CIV. CODE § 1750 et seq. (California);

     f.     COLO. REV. STAT. ANN. § 6-1-101 et seq. (Colorado);

     g.     CONN. GEN. STAT. ANN. § 42-110a et seq. (Connecticut);

     h.     DEL. CODE ANN. tit. 6, § 2511 et seq. (Delaware);

     i.     D.C. CODE ANN. § 28-3901 et seq. (District of Columbia);

     j.     FLA. STAT. ANN. § 501.201 et seq. (Florida);

     k.     GA. CODE ANN. § 10-1-370 et seq. and GA. CODE ANN. § 10-1-390 et seq. (Georgia);

     l.     HAW. REV. STAT. ANN. § 480-1 et seq. and HAW. REV. STAT. ANN. § 481A-1 et seq. (Hawai'i);

     m.     IDAHO CODE ANN. § 48-601 et seq. (Idaho);

     n.     815 ILCS 505/1 et seq. (Illinois);

     o.     IND. CODE ANN. § 24-5-0.5-0.1 et seq. (Indiana);

     p.     IOWA CODE § 714.16 et seq.

     q.     KAN. STAT. ANN. § 50-623 et seq. (Kansas);

     r.     KY. REV. STAT. ANN. § 367.110 et seq. (Kentucky);

     s.     LA. STAT. ANN. § 51:1401 et seq. (Louisiana);

     t.     ME. REV. STAT. tit. 5, § 205-A et seq. (Maine);

     u.     MD. CODE ANN., COM. LAW § 13-101 et seq. (Mary-land);

     v.     MASS. GEN. LAWS ANN. ch. 93A, § 1 et seq. (Massachusetts);

     w.     MICH. COMP. LAWS ANN. § 445.901 et seq. (Michigan);

x.    MINN. STAT. ANN. § 325F.68 et seq., MINN. STAT. ANN. § 325D.09 et seq., MINN. STAT. ANN. § 325D.43 et seq., and MINN. STAT. ANN. § 325F.67 (Minnesota);

y.    MISS. CODE ANN. § 75-24-1 et seq. (Mississippi);

z.    MO. ANN. STAT. § 407.010 et seq. (Missouri);

aa.   MONT. CODE ANN. § 30-14-101 et seq. (Montana);

bb.   NEB. REV. STAT. ANN. § 59-1601 et seq. (Nebraska);

cc.   NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN. §598.0903 et seq. (Nevada);

dd.   N.H. REV. STAT. ANN. § 358-A:1 et seq. (New Hampshire);

ee.   N.J. STAT. ANN. § 56:8-1 et seq. (New Jersey);

ff.   N.M. STAT. ANN. § 57-12-1 et seq. (New Mexico);

gg.   N.Y. GEN. BUS. LAW. § 349 et seq. (New York);

hh.   N.C. GEN. STAT. ANN. § 75-1 et seq. (North Carolina);

ii.   N.D. CENT. CODE ANN. § 51-15-01 et seq. (North Dakota);

jj.   OHIO REV. CODE ANN. § 1345.01 et seq. (Ohio);

kk.   OKLA. STAT. ANN. tit. 15, § 751 et seq. (Oklahoma);

ll.   OR. REV. STAT. ANN. § 646.605 et seq. (Oregon);

mm.   73 PA. STAT. ANN. § 201-1 et seq. (Pennsylvania);

nn.   6 R.I. GEN. LAWS ANN. § 6-13.1-1 et seq. (Rhode Island);

oo.   S.C. CODE ANN. § 39-5-10 et seq. (South Carolina);

pp.   S.D. CODIFIED LAWS § 37-24-1 et seq. (South Dakota);

qq.   TENN. CODE ANN. § 47-18-101 et seq. (Tennessee);

rr.   TEX. BUS. & COM. CODE ANN. § 17.41 et seq. (Texas);

ss.   UTAH CODE ANN. § 13-11-1 et seq. (Utah);

tt.   VT. STAT. ANN. tit. 9, § 2451 et seq. (Vermont);

uu.   VA. CODE ANN. § 59.1-196 et seq. (Virginia);

vv.   WASH. REV. CODE ANN. § 19.86.010 et seq. (Washing-ton);

ww.    W.VA. CODE ANN. § 46A-6-101 et seq. (West Virginia);

xx.    WIS. STAT. ANN. § 100.20 (Wisconsin); and

yy.    WYO. STAT. ANN. § 40-12-101 et seq. (Wyoming).

105.    Plaintiffs and members of the Classes have standing to assert claims under the Consumer Protection Acts because they are consumers within the meaning of the Consumer Protection Acts and Defendants' practices were addressed to the market generally and otherwise implicate consumer protection concerns.

106.    Defendants have engaged in and continue to engage in the unfair, unlawful and deceptive trade practices outlined in this Class Action Complaint.

107.    Throughout the class period, Defendants have unfairly and deceptively advertised and represented to Plaintiffs and class members that Seagram's was "Made with Real Ginger." But Defendants failed to inform Plaintiffs and class members that Seagram's was not made with real ginger but was instead made from a flavoring compound containing a miniscule amount of a ginger flavor extract, which was present in quantities too small to impart flavor to the beverage or provide any health benefits.

108.    Defendants intended for Plaintiffs and the Class members to rely on the unlawful, fraudulent, and/or unfair business acts and practices alleged herein.

109.    Plaintiffs and those similarly situated relied to their detriment on Defendants' unfair, deceptive and unlawful business practices.  Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by not purchasing (or paying less for) Defendants' Products.

110.    Defendants' acts and omissions are likely to deceive the general public.

111.    Defendants' actions, which were knowing, willful, and wanton, constitute intentional violations of the Consumer Protection Acts.

112.    Defendants engaged in these unfair practices to increase profits.

113.    Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by the Consumer protection Acts.

114.    The aforementioned practices, which Defendants have used to their significant

financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

115.    Plaintiffs seek, on behalf of those similarly situated, full damages, as necessary and according to proof, to restore any and all monies acquired from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon. Plaintiffs also seek to recover attorneys' fees, costs, and expenses to be assessed against Defendants, within the limits set forth by applicable law.

116.    Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein.

117.    Plaintiffs and those similarly situated are further entitled to and do seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent, and injunctive relief restraining Defendants from engaging in any of such deceptive, unfair and/or unlawful trade practices in the future.  Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate Consumer Protection Acts, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the Consumer Protection Acts alleged to have been violated herein.

118.    As a direct and proximate result of such actions, Plaintiffs and the other members of the Classes have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the Classes lost the amount they paid for the Products.

119.    As a direct and proximate result of such actions, Defendants have enjoyed, and

1 continue to enjoy, significant financial gain in an amount which will be proven at trial, but which

2 is in excess of the jurisdictional minimum of this Court.

3      120.    Plaintiffs also requests that this Court award her costs and reasonable attorneys'

4 fees pursuant to the Consumer Protection Acts.

5      121.    On December 29, 2016, Plaintiffs delivered a demand letter to Defendants by

6 mailing, certified mail, return receipt requested, a demand letter to Defendant and its registered

7 agent. Defendant acknowledged receipt on January 12, 2017.

8      122.    The letters described the above-referenced unfair and deceptive acts and practices,

9 set forth the nature of Plaintiff's and the Classes' injury, and requested relief from Defendants

10 within 30 days.

11      123.    Defendants did not respond to the letters within 30 days nor did Defendants tender

12 any offer of settlement or other form of relief.

13      124.    The demand letters satisfy any notification or presentment requirements under the

14 Consumer Protection Acts.

15      125.    Alternatively, providing notice to Defendants would have been futile in light of

16 Defendants' non-response to these letters, and Defendants' failure to change its label despite

17 nearly two years of litigation in California.

18                    **PLAINTIFFS' SECOND CAUSE OF ACTION**
                      *(Fraud, Deceit and/or Misrepresentation)*
19                    **On Behalf of the Nationwide Class**

20      126.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action

21 Complaint as if set forth herein.

22      127.    Throughout the last four years, at weekly and monthly intervals, Defendants

23 fraudulently and deceptively informed Plaintiffs and class members that the Products were "Made

24 with Real Ginger." But Defendants failed to inform Plaintiffs and class members that Seagram's

25 was not made with real ginger but was instead made from a flavoring compound containing a

26 miniscule amount of a ginger flavor extract, which was present in quantities too small to impart

27 flavor to the beverage or provide any health benefits.

28      128.    These misrepresentations and omissions were known exclusively to, and actively

-32-

concealed by, Defendants, not reasonably known to Plaintiff, and material at the time they were made. Defendants knew the composition of the Product, and they knew that the soft drinks were made with a flavour compound containing miniscule amount of ginger flavor extracts, not ginger root. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase Defendants' ginger ales.  In misleading Plaintiffs and not so informing Plaintiffs, Defendants breached their duty to them. Defendants also gained financially from, and as a result of, their breach.

129.    Plaintiff and those similarly situated relied to their detriment on Defendants' misrepresentations and fraudulent omissions.  Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Product, (ii) purchasing less of them, or (iii) paying less for the Product.

130.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiff and those similarly situated to alter their position to their detriment.  Specifically, Defendants fraudulently and deceptively induced Plaintiff and those similarly situated to, without limitation, to purchase the Product.

131.    Plaintiff and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

132.    As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiff and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Product.

133.    Defendants' conduct as described herein was wilful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiff and those similarly situated.

**PLAINTIFFS' THIRD CAUSE OF ACTION**
*(False Advertising, Business and Professions Code § 17500, et seq. ("FAL"))*
**On Behalf the California Subclass**

134.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

135.    Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Product.

136.    Defendants made representations and statements (by omission and commission) that led reasonable customers to believe that the Product that they were purchasing were made with, and contained, real ginger root.

137.    Plaintiffs and those similarly situated relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth in paragraphs 19-22, 29-39, and 50-55 above.  Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing Defendants' ginger ales or paying less for them.

138.    Defendants' acts and omissions are likely to deceive the general public.

139.    Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits.  Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

140.    The aforementioned practices, which Defendants used, and continue to use, to their significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendants' competitors as well as injury to the general public.

141.    As a direct and proximate result of such actions, Plaintiffs and the other class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

142.    Plaintiffs seeks, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus

interest thereon.

143.    Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

144.    Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they are not entitled.  Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### PLAINTIFFS' FOURTH CAUSE OF ACTION
*(Unlawful, unfair, and fraudulent trade practices in violation of Business and Professions Code § 17200, et seq. and similar state laws)*
### On Behalf of the Consumer Unfairness/Unlawfulness Subclass

145.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

146.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendants have engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California and other states by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

147.    In particular, Defendants have engaged, and continue to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the Consumer Protection Acts of every state; (iv) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (v) the misbranded

food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110740, 110760, 110765, and 110770; and (vi) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. 101.3, 101.4, 101.13, 101.14, and 101.22, which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

148.    In particular, Defendants have engaged, and continue to engage, in unfair and fraudulent practices by, without limitation, the following: (i) misrepresenting that the Product is "made with real ginger;" and (ii) failing to inform Plaintiff, and those similarly situated, that the Products that they purchased are made with a flavor compound manufactured to mimic the taste of ginger by using miniscule amounts of ginger flavour extracts, rather than real ginger root.

149.    Plaintiff and those similarly situated relied to their detriment on Defendants' unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Product, (ii) purchasing less of the Product, or (iii) paying less for the Product.

150.    Defendants' acts and omissions are likely to deceive the general public.

151.    Defendants engaged in these deceptive and unlawful practices to increase their profits.  Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

152.    The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

153.    As a direct and proximate result of such actions, Plaintiff and the other class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the class members lost the amount they paid for the Product.

154.    As a direct and proximate result of such actions, Defendants have enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

155.    Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon.

156.    Plaintiffs seek, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

157.    Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the deceptive and/or unlawful trade practices complained of herein.  Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they were not entitled.  Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

<div align="center">

**PLAINTIFFS' FIFTH CAUSE OF ACTION**

*(Unjust Enrichment)*

**On Behalf of the Nationwide Class**

</div>

158.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

159.    By means of Defendant's wrongful conduct alleged herein, Defendant knowingly caused Seagram's to be sold to Plaintiffs and members of the Nationwide Class in a manner that was unfair, unconscionable, and oppressive.

160.     Defendant knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Nationwide Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Nationwide Class.

161.     As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Nationwide Class.

162.     Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

163.     Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, without justification, from causing Seagram's to be sold to Plaintiffs and members of the Nationwide Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

164.     The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Nationwide Class. Defendant should be compelled to return in a common fund for the benefit of Plaintiffs and members of the Nationwide Class all wrongful or inequitable proceeds received by them.

165.     Plaintiffs and members of the Nationwide Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and those similarly situated, respectfully requests that the Court enter judgment against Defendants as follows:

A.   Certification of the proposed Nationwide Class, and California, Pennsylvania, New York, New Jersey, and Florida Subclasses, including appointment of Plaintiff's counsel as class counsel;

B.   An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.   An award of compensatory damages in an amount to be determined at trial;

D.  An award of statutory damages in an amount to be determined at trial;

E.  An award of punitive damages in an amount to be determined at trial;

F.  An award of treble damages;

G.  An award of restitution in an amount to be determined at trial;

H.  An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I.  For reasonable attorney's fees and the costs of suit incurred;

J.  For such further relief as this Court may deem just and proper;

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: January 29, 2018                    **GUTRIDE SAFIER LLP**

_____

Adam J. Gutride, Esq.
Seth A. Safier, Esq.
Marie A. McCrary, Esq.
Matthew T. McCrary, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

Attorneys for Plaintiff

# Exhibit 2

1  **GUTRIDE SAFIER LLP**
2  ADAM J. GUTRIDE (State Bar No. 181446)
   SETH A. SAFIER (State Bar No. 197427)
3  MARIE A. MCCRARY (State Bar No. 262670)
   100 Pine Street, Suite 1250
4  San Francisco, CA 94111
   Telephone: (415) 271-6469
5  Facsimile: (415) 449-6469

6  MATTHEW T. MCCRARY (admitted *pro hac vice*)
7  265 Franklin St, Suite 1702
   Boston, MA 02110
8  Telephone: (214) 502-2171

9  Attorneys for Plaintiff

10                    UNITED STATES DISTRICT COURT

11                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  JACKIE FITZHENRY-RUSSELL, DAVID          CASE NO. 5:17-CV-00603-EJD
    SWARTZ, ASHLEY SALCEDO, SCOTT
14  MILLER, ISABELO PASCUAL,  FLORIN         UNLIMITED CIVIL CASE
    CARLIN, and KRISTINA HOFFMAN, on
15  behalf of themselves, the general public and  **SECOND AMENDED COMPLAINT**
    those similarly situated,                **FOR VIOLATION OF THE**
16                                            **CONSUMER PROTECTION ACTS OF**
        Plaintiff,                            **50 STATES AND THE DISTRICT OF**
17                                            **COLUMBIA; FRAUD, DECEIT,**
                                              **AND/OR MISREPRESENTATION;**
18          v.                                **VIOLATION OF CALIFORNIA'S**
                                              **FALSE ADVERTISING AND UNFAIR**
19  THE COCA COLA COMPANY, and DOES 1-       **COMPETITION LAWS**
    50,
20                                            JURY TRIAL DEMANDED
        Defendants.
21

22

23

24

25

26

27

28

                              Class Action Complaint

**INTRODUCTION**

1.     Plaintiffs Jackie Fitzhenry-Russell, David Swartz, Ashley Salcedo, Scott Miller, Isabelo Pascual, Florin Carlin, and Kristina Hoffman, by and through their counsel, bring this class action against Defendants The Coca Cola Company and Does 1-50, inclusive, on behalf of themselves, the general public, and those similarly situated, for violations of the Consumer Protection Acts of all 50 states and the District of Columbia; common law fraud, deceit, and/or misrepresentation; violations of California's False Advertising Law; and violation of California's Unfair Competition Law.  The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

2.     This case concerns Defendants' false and deceptive labeling, advertising, marketing, and sale of all Seagram's brand ginger ales labeled as "Made with Real Ginger" ("Seagram's or the "Products").[1] This representation leads consumers to reasonably believe that Defendants' soft drink is made with, and contains, real ginger root—not chemically derived extracts of the ginger plant—and that consumers who drink the soft drink will receive the health benefits associated with consuming real ginger root. Indeed, consumer surveys demonstrate that more than 75% of people believe a drink claiming to be "Made with Real Ginger" is made using actual ginger root and **not** extracts. Further consumer research demonstrates that when a marketer claims its product is made with an ingredient that is widely known to be healthy—such as ginger root, which has long been perceived as a natural remedy—then consumers will reasonably infer that the product is a healthier alternative to products that are not made with the ingredient.

3.     In truth, Defendants' soft drink is not made with real ginger root. Instead, Seagram's Ginger Ale is made with carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavors," i.e., a flavor compound that is manufactured in a laboratory-setting using various chemicals and extraction processes. Although the flavor compound contains a miniscule amount of ginger flavor extract, reasonable consumers expect the drink to be made

---

[1] These include at least the following: Seagram's Ginger Ale; Seagram's Diet Ginger Ale; Seagram's Ginger Ale, 25% Fewer Calories; Seagram's Raspberry Ginger Ale; Seagram's Diet Raspberry Ginger Ale.

with ginger root, not a ginger flavor extract because the product states it is "Made with Real Ginger." Further, the miniscule amount of flavor extract comprises barely **three parts per million** of the final beverage. When a manufacturer claims a product is "made with" a particular ingredient, reasonable consumers expect the product to be a "good source" of that ingredient. Here, that would require there to be enough "real ginger" to provide the health benefits consumers associate with the ingredient, or at least to impart a ginger flavor to the beverage. This microscopic amount of ginger flavor extract does neither. It provides none of the health benefits consumers associate with real ginger and even appears to fall below the threshold concentration at which the average consumer can perceive a "ginger" flavor, requiring the addition of other flavors to mimic or enhance the perceptibility of "ginger."[2] Defendants' product labels never disclose that the ginger ale is made with a miniscule amount of a flavor compound manufactured to mimic the taste of real ginger root, rather than with real ginger root.

4.   Throughout the Class Period, Defendants prominently made the claim "Made with Real Ginger" on the front label panel of all of its Seagram's Ginger Ale cans and bottles, cultivating a wholesome and healthful image in an effort to promote the sale of its soft drink and to compete with small batch ginger ales that are made with real ginger root. Consumers rely on and value the representation "Made with Real Ginger" because studies have found that real ginger root has health benefits when consumed. The "Made with Real Ginger" claim caused consumers to pay a price premium of at least 6% of the purchase price.

## PARTIES

5.   Jackie Fitzhenry-Russell is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Santa Cruz, California.

6.   David Swartz is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Berkeley, California.

7.   Ashley Salcedo is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Harrisburg, Pennsylvania.

_____
[2] *See* Fisher, C. and Scott T., Food Flavours Biology and Chemistry (1997) (noting that the threshold concentration for tasting ginger compounds is between 7 and 17 parts per million).

8.     Scott Miller is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Auburndale, Florida.

9.     Isabelo Pascual is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Los Angeles, California.

10.    Florin Carlin is, and at all times alleged in this Class Action Complaint was, an individual and a resident of St. Petersburg, Florida.

11.    Kristina Hoffman is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Medford, New Jersey.

12.    Defendant The Coca Cola Company is a corporation existing under the laws of the State of Delaware, having its principal place of business in Atlanta, Georgia.

13.    The true names and capacities of Defendants sued as Does 1 through 50, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names pursuant to section 474 of the California Code of Civil Procedure.  Plaintiff will seek leave of Court to amend this Class Action Complaint when said true names and capacities have been ascertained.

14.    The Parties identified in paragraphs 13-14 of this Class Action Complaint are collectively referred to hereafter as "Defendants."

15.    At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

16.    At all times herein mentioned, each of the Defendants was a member of, and engaged in, a joint venture, partnership and common enterprise, and acted within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

17.    At all times herein mentioned, the acts and omissions of each of the Defendants concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

18.    At all times herein mentioned, each of the Defendants ratified each and every act

Seth Safier 1/29/19 1:17 PM
Deleted: 6 - 8

Seth Safier 1/29/19 1:17 PM
Deleted: -
Seth Safier 1/29/19 1:17 PM
Formatted: Default Paragraph Font
Seth Safier 1/29/19 1:17 PM
Deleted: -

or omission complained of herein.

19.　At all times herein mentioned, each of the Defendants aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

## JURISDICTION AND VENUE

20.　This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). Defendant averred on removal that the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this action is a class action in which at least one member of the class is a citizen of a State different from the Defendants.

21.　The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

22.　Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

23.　In accordance with California Civil Code Section 1780(d), Plaintiff concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased Seagram's Ginger Ale in Santa Cruz, California and Capitola, California. (Plaintiff's declaration is attached hereto as Exhibit A.)

24.　Plaintiffs accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Ginger Ales.

25.　Defendants manufacture, distribute, market, advertise, and sell soft drinks in the United States under several brand names, including "Seagram's." Defendants' packaging for the Seagram's Ginger Ale predominately, uniformly, and consistently state on the principal display

Class Action Complaint

panel of the product labels that it is "Made with Real Ginger".

26.     The representation that the Product is "Made with Real Ginger" was uniformly
communicated to Plaintiffs and every other person who purchased any of the Products. An
exemplar the Product's product label is attached hereto as Exhibit B.  The same or substantially
similar product label has appeared on each bottle or can sold (as those shown in Exhibit B) during
the entirety of the Class Period.

27.     As described in detail below, Defendants' advertising and labeling of the Product,
as made with "Real Ginger" is false, misleading, and intended to induce consumers to purchase
the ginger ales, at a premium price, while ultimately failing to meet consumer expectations. These
representations deceive and mislead reasonable consumers into believing that the Product is made
with, and contains, real ginger root—not chemically derived extracts of the ginger plant—and that
consumers who drink the soft drink will receive the health benefits associated with consuming
real ginger root. Indeed, consumer surveys demonstrate that more than 75% of people believe a
drink claiming to be "Made with Real Ginger" is made using actual ginger root and **not** extracts.
Further consumer research demonstrates that when a marketer claims its product is made with an
ingredient that is widely known to be healthy—such as ginger root, which has long been
perceived as a natural remedy—then consumers will reasonably infer that the product is a
healthier alternative to products that are not made with the ingredient.

28.     In fact, the Product is not made with real ginger. Instead, Seagram's is made with
carbonated water, high fructose corn syrup, citric acid, preservatives, and "natural flavors," i.e., a
flavor compound that is manufactured in a laboratory-setting using various chemicals and
extraction processes. Although the flavor compound contains a miniscule amount of ginger flavor
extract, reasonable consumers expect the drink to be made with ginger root, not a ginger flavor
extract because the product states it is "Made with Real Ginger." Further, the miniscule amount of
flavor extract comprises barely ***three parts per million*** of the final beverage.

29.     When a manufacturer claims a product is "made with" a particular ingredient,
reasonable consumers expect the product to be a "good source" of that ingredient.  Here, that
would require there to be enough "real ginger" to provide the health benefits consumers associate

---

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** MADE FROM REAL GINGER"
(referred to herein as the "Product").

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** MADE FROM REAL GINGER

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** Plaintiff

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** in California.

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** from "REAL GINGER

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** from

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** .  .
In fact, the Product is not made from real

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** .  The Product is made from carbonated
water, high fructose corn syrup, citric acid,
preservatives, and "natural flavor," which is a
chemical flavoring compound that is manufactured
to mimic the taste of ginger, but does not contain
ginger as a reasonable consumer understands it to
mean and contains none of the health benefits of real
ginger root.

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** -

**Seth Safier 1/29/19 1:17 PM**
**Formatted:** Default Paragraph Font

**Seth Safier 1/29/19 1:17 PM**
**Deleted:** -

with the ingredient, or at least to impart a ginger flavor to the beverage. This microscopic amount of ginger flavor extract does neither. It provides none of the health benefits consumers associate with real ginger and even appears to fall below the threshold concentration at which the average consumer can perceive a "ginger" flavor, requiring the addition of other flavors to mimic or enhance the perceptibility of "ginger."

**Consumer Demand for Real Ginger**

30.     Many American consumers are health conscious and seek wholesome, natural foods to keep a healthy diet, so they routinely take nutrition information into consideration in selecting and purchasing food items. Product package labels convey nutrition information to consumers that they use to make purchasing decisions. As noted by FDA commissioner Margaret Hamburg during an October 2009 media briefing, "[s]tudies show that consumers trust and believe the nutrition facts information and that many consumers use it to help them build a healthy diet." Consumers attribute a myriad of benefits to ginger and foods made with real ginger root.

31.     Ginger root has been used for thousands of years for the treatment of numerous ailments, such as colds, nausea, arthritis, migraines, and hypertension. Scientific studies have confirmed that ginger has anti-inflammatory effects and aids in relaxing muscles, is effective in alleviating symptoms of nausea and vomiting, has anti-carcinogenic qualities, and appears to reduce cholesterol and improve lipid metabolism, thereby helping to decrease the risk of cardiovascular disease and diabetes. The benefits of consuming ginger have been widely publicized to consumers in the United States in recent years.

**Federal and State Regulations Governing Food Labeling**

32.     The Food and Drug Administration has defined "natural flavor" to mean "the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, seafood, poultry, eggs, dairy Product, or fermentation products thereof, whose significant function in food is flavoring rather than nutritional." 21 C.F.R. 501.22(a)(3). In

1  other words, a "natural flavor" is one that contains some oil, protein, or essence from a plant or

2  animal. But it bears little resemblance to the actual plant or animal from which it is derived.

3  Rather, natural flavors are made in a laboratory by scientists who make determinations on how to

4  replicate a flavor using chemicals found in nature.

5       33.     While it may be that ginger root is used in the creation of the natural flavor, it is

6  not ginger as a reasonable consumer would understand it. Rather, the scientists that created the

7  "natural flavor" added to the Product would have isolated proteins from the cells and tissue of the

8  ginger root or extracted oils or essences from the ginger root. But because those isolated

9  compounds may not actually taste like ginger, the scientist would have then combined those

10  extractions with any number of other extractions from other plants and animals to create a

11  flavoring substance that tastes like ginger. *See* https://www.scientificamerican.com/article/what-

12  is-the-difference-be-2002-07-29/ (describing the process for creating natural flavors) (last

13  accessed October 21, 2016).

14       34.     Identical federal and California laws regulate the content of labels on packaged

15  food and require truthful, accurate information on the labels of packaged foods. The requirements

16  of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including

17  those set forth in 21 C.F.R. §§ 101 and 102, were adopted by the California legislature in the

18  Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code §

19  110100 ("All food labeling regulations and any amendments to those regulations adopted

20  pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be

21  the food labeling regulations of this state."). The federal laws and regulations discussed below are

22  applicable nationwide to all sales of packaged food Product. Additionally, no state imposes

23  different requirements on the labeling of packaged food for sale in the United States.

24       35.     Under both the Sherman Law and FDCA section 403(a), food is "misbranded" if

25  "its labeling is false or misleading in any particular," or if it does not contain certain information

26  on its label or in its labeling. California Health & Safety Code § 110660; 21 U.S.C. § 343(a).

27       36.     Under the FDCA, the term *false* has its usual meaning of "untruthful," while the

28  term ***misleading*** is a term of art that covers labels that are technically true, but are likely to

1  deceive consumers. Under the FDCA, if any single representation on the labeling is false or

2  misleading, the entire food is misbranded, and no other statement in the labeling can cure a

3  misleading statement.

4        37.     Further in addition to its blanket adoption of federal labeling requirements,

5  California has also enacted a number of laws and regulations that adopt and incorporate specific

6  enumerated federal food laws and regulations. *See* California Health & Safety Code § 110660

7  (misbranded if label is false and misleading); California Health & Safety Code § 110705

8  (misbranded if words, statements and other information required by the Sherman Law are either

9  missing or not sufficiently conspicuous); and California Health & Safety Code § 110740

10  (misbranded if contains artificial flavoring, artificial coloring and chemical preservatives but fails

11  to adequately disclose that fact on label).

12        38.     Under California law, a food product that is "misbranded" cannot legally be

13  manufactured, advertised, distributed, sold, or possessed. Misbranded Product has no economic

14  value and are legally worthless.

15        39.     Representing that a soft drink is made with "real ginger" is a statement of fact, and

16  use of this phrase on the labels of packaged food is limited by the aforementioned misbranding

17  laws and regulations.

18  **Defendants' Marketing and Labeling of its Ginger Ales Violates State and Federal Food**

19  **Labeling Laws**

20        40.     The Product is unlawful, misbranded and violates the Sherman Law, California

21  Health & Safety Code § 110660, *et seq.*, because the Product's labels include the phrase "Made

22  with Real Ginger," even though they are not made using real ginger. Instead, the Product is

23  made with a complex flavoring compound (i.e., "natural flavors") that is manufactured

24  in a laboratory-setting using various chemicals and extraction processes and designed to mimic

25  the taste of ginger. Although the flavor compound contains a miniscule amount of ginger flavor

26  extract, reasonable consumers expect the drink to be made with ginger root, not a ginger flavor

27  extract because the product states it is "Made with Real Ginger." They also expect the beverage to

28  be a good source of "real ginger" since Defendants highlighted that the beverage was "made

                                         -8-

Seth Safier 1/29/19 1:17 PM
Deleted: from

Seth Safier 1/29/19 1:17 PM
Deleted: violate

Seth Safier 1/29/19 1:17 PM
Deleted: MADE WITH REAL GINGER

Seth Safier 1/29/19 1:17 PM
Deleted: flavored

Seth Safier 1/29/19 1:17 PM
Deleted: chemical

Seth Safier 1/29/19 1:17 PM
Deleted:  to mimic the taste of ginger, and was created not by using actual ginger root, but in a laboratory through the isolation of proteins, essences, and oils from the cells and tissues of plants and animals and combining them in such a way as to mimic the taste of ginger as a consumer would recognize it. The Product is not made from, and do not contain, real ginger as a reasonable consumer would understand it to mean

Seth Safier 1/29/19 1:17 PM
Formatted: No bullets or numbering

Seth Safier 1/29/19 1:17 PM
Deleted: -

Seth Safier 1/29/19 1:17 PM
Formatted: Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
Deleted: -

with" that ingredient. In truth, the miniscule amount of flavor extract Defendants use to make Seagram's comprises barely ***three parts per million*** of the final beverage. Seagram's is not made with, and does not contain, real ginger as a reasonable consumer would understand it, nor does it provide any of the health benefits that would be obtained if real ginger root were used or present. The microscopic amount of flavor extract even appears to fall below the threshold concentration at which the average consumer can perceive a "ginger" flavor, requiring the addition of other flavors to mimic or enhance the perceptibility of "ginger."

Seth Safier 1/29/19 1:17 PM
**Deleted:** do the products contain

41. Defendants' marketing, advertising, and sale of the Product violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including but not limited to:

a. Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

b. Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

c. Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

42. Defendants' marketing, advertising, and sale of the Product violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

d. Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

e. Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

f. Section 110740 (a food is misbranded if it contains artificial flavoring, artificial

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

1  coloring and chemical preservatives but fail to adequately disclose that fact on

2  their labeling);

3  g.  Section 110760, which makes it unlawful for any person to manufacture, sell,

4  deliver, hold, or offer for sale any food that is misbranded;

5  h.  Section 110765, which makes it unlawful for any person to misbrand any food;

6  and

7  i.  Section 110770, which makes it unlawful for any person to receive in commerce

8  any food that is misbranded or to deliver or proffer for delivery any such food.

9  43.  Defendants have violated 21 U.S.C. § 343(a), and the standards set by FDA

10  regulations, including but not limited to 21 C.F.R. §§ 101.3, 101.13, 101.14, 101.22, and 101.65

11  which have been incorporated by reference in the Sherman Law, by failing to include on their

12  product labels the nutritional information required by law.

**Defendants' Marketing and Labeling of its Ginger Ales is False, Deceptive and Misleading**

14  44.  A reasonable consumer would expect that the Products contain what Defendants

15  identifies them to contain on the product labels. A reasonable consumer would expect that when

16  Defendants label the Product as being "Made with Real Ginger," the soft drinks are made with,

17  and contain, real ginger, i.e., ginger root, and not chemically-derived flavor extracts.

18  45.  Moreover, Defendants do not disclose on the product labels that the Product is

19  flavored with a chemical compound that was manufactured to mimic the flavor of ginger.

20  Consumers lack the meaningful ability to test or independently ascertain the truthfulness of

21  Defendants' food labeling claims, especially at the point of sale. Consumers would not know the

22  true nature of the ginger flavoring merely by reading the ingredient label; its discovery requires

23  investigation beyond the grocery store and knowledge of food chemistry beyond that of the

24  average consumer. An average consumer does not have the specialized knowledge necessary to

25  ascertain that the ginger flavor in the soft drink is not from the presence of real ginger in the soft

26  drink but instead comes from a flavor compound manufactured to make the drink taste like

27  ginger.  That, combined with Defendants' active concealment in representing the Product as being

28  "Made with Real Ginger," and not disclosing otherwise, gave the average reasonable consumer

10

Seth Safier 1/29/19 1:17 PM  Deleted: Product contains
Seth Safier 1/29/19 1:17 PM  Deleted: MADE WITH REAL GINGER
Seth Safier 1/29/19 1:17 PM  Deleted: as commonly understood and would not be contrary to the policies or regulations of the State of California and/or the FDA.
Seth Safier 1/29/19 1:17 PM  Deleted: the chemical compounded added to
Seth Safier 1/29/19 1:17 PM  Deleted: to make it
Seth Safier 1/29/19 1:17 PM  Deleted: MADE FROM REAL GINGER
Seth Safier 1/29/19 1:17 PM  Deleted: -
Seth Safier 1/29/19 1:17 PM  Formatted: Default Paragraph Font
Seth Safier 1/29/19 1:17 PM  Deleted: -

no reason to suspect that Defendants' representations on the packages were not true, and therefore

consumers had no reason to investigate whether the soft drinks contained real ginger.  Thus,

reasonable consumers relied on Defendants' representations regarding the nature of the Products.

Such reliance by consumers is also eminently reasonable, since food companies are prohibited

from making false or misleading statements on their products under federal law.

46.    Defendants intend and know that consumers will and do rely upon food labeling

statements in making their purchasing decisions. Label claims and other forms of advertising and

marketing drive product sales, particularly if placed prominently on the front of product

packaging, as Defendants have done with the "Made with Real Ginger" claim.

**Defendants' Website and Other Marketing Confirms That Defendants Intends to Deceive Consumers**

47.    Defendants' own long standing advertising and marketing materials show that

Defendants intended to deceive consumers into believing the false and deceptive packaging of the

Product.

48.    Defendants' advertising campaign typically shows a picture of the bottle or can of

the Product, where the words "Made with Real Ginger" Are prominently featured. The can with

those words appears both on Defendants' websites and in a variety of print advertisements.

49.    Defendants also permit and encourage their marketing partners, including grocery

stores, to advertise, market, advertise and sell the Product as a soft drink "Made with Real

Ginger." Defendants provide their marketing partners information, including posters, signs, end

cap displays, etc., that specifically represent that the Product is "Made with Real Ginger."

Further, in sales sheets, sales presentations, and other marketing materials, Defendants state that

the Product is "Made with Real Ginger."

50.    In short, Defendants' advertising and marketing campaign confirms that

Defendants intend to deceive consumers through misrepresentations on the Product's product

labels.  More specifically, Defendants intend that consumers who read the Product's labels

believe that the Product is made with, and contains, real ginger, i.e., ginger root, and not

chemically-derived flavor extracts.

11

Seth Safier 1/29/19 1:17 PM
**Deleted:** .

Seth Safier 1/29/19 1:17 PM
**Deleted:** MADE WITH REAL GINGER

Seth Safier 1/29/19 1:17 PM
**Deleted:** MADE WITH REAL GINGER

Seth Safier 1/29/19 1:17 PM
**Deleted:** .

Seth Safier 1/29/19 1:17 PM
**Deleted:** MADE FROM REAL GINGER

Seth Safier 1/29/19 1:17 PM
**Deleted:** MADE FROM REAL GINGER

Seth Safier 1/29/19 1:17 PM
**Deleted:** MADE FROM REAL GINGER."

Seth Safier 1/29/19 1:17 PM
**Deleted:** that

Seth Safier 1/29/19 1:17 PM
**Deleted:** be effectively deceived by Defendants'

Seth Safier 1/29/19 1:17 PM
**Deleted:** from

Seth Safier 1/29/19 1:17 PM
**Deleted:** .

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

**Defendants' Employ Misleading Marketing Their Ginger Ales To Increase Profits and Gain a Competitive Edge**

51.     Defendants do not use real ginger in their Product as doing so is more expensive than using flavoring compound. In recent years, numerous studies have found the presence of lead in ginger, and manufacturers and retailers of other products containing ginger root, such as cookies and candies, have been sued by the California Attorney General. Thus, the diligent sourcing and testing procedures that would be required when using real ginger to ensure the product they sell is safe are more expensive to adopt than simply using "natural flavor." In addition, the cost of real ginger has increased in recent years, due to changes in weather in China, which produces 75% of the world's ginger. *See* http://www.producenews.com/news-dep-menu/test-featured/9579-ginger-prices-skyrocket-on-shrinking-supply (last accessed October 21, 2016).

52.     In the last decade, in response to news reports about the dangers of high fructose corn syrup and soda's role in contributing to the increased rates of obesity and diabetes in this country, many consumers are drinking less soda, and are seeking out instead, healthier beverages, like iced teas and flavored waters. *See* http://www.nytimes.com/2015/10/04/upshot/soda-industry-struggles-as-consumer-tastes-change.html?_r=0 (last accessed October 21, 2016). And while soda sales are declining, one segment of the category is on the rise – small companies and brands that emphasize their use of natural ingredients, such as Reed's, Bruce Cost, Maine Root, and Grown Up Soda. In 2014, the Specialty Food Association noted that healthy beverages were growing in popularity, as was the market for more sophisticated, specialty sodas containing all natural ingredients. *See* https://www.specialtyfood.com/news/article/rise-healthy-beverages/ (last accessed October 21, 2016). Thus, many small craft soda companies are flourishing in response to increased consumer demand for alternatives to sodas made with high fructose corn syrup, artificial ingredients, and preservatives. Facing a public hostile to "Big Soda" and finding its sales dwindling due to the newer, healthier brands, Defendants have an incentive to emphasize the presence of ginger in the Product to appeal to consumers seeking real ingredients instead of a traditional soda.

53.     In making the false, misleading, and deceptive representations, Defendants

12

Class Action Complaint

distinguish their ginger ales from their competitors' Product. Defendants knew and intended that consumers would purchase, and pay a premium for, ginger ales labeled as being made with "Real Ginger," over comparable ginger ales that do not contain these representations on the product labels. By using this branding strategy, Defendants are stating that their ginger ales are superior to, better than, and more nutritious and healthful than other brands of ginger ales that do not proclaim to be made with "Real Ginger." For example, other brands of ginger ales that do not contain the false, misleading, and deceptive representation that they are made with "Real Ginger," include brands such as Dr. Brown's and Vernors.

54.     Further, Defendants knew and intended their representations to help them compete with small batch bottling companies that do make ginger ales using real ginger root. Defendants added the "Made with Real Ginger" representation to their product labels to compete with such small batch bottling companies that have increased in popularity in recent years. For example, Bruce Cost Ginger Ale is made with fresh whole ginger root and represents this fact to consumers in its advertising and on its product packaging. Likewise Reed's is brewed using ginger root and represents this fact to consumer on its label.

55.     Because consumers pay a price premium for products made with real ginger, by labeling their products as containing real ginger without actually using the expensive ingredient, Defendants are able to both increase their sales and retain more in profits. Studies have shown that the "Made with Real Ginger" representation caused consumers to pay a premium of at least 6% of the purchase price for the Products.

56.     Defendants engaged in the practices complained of herein to further their private interests of: (i) increasing sales of their ginger ales, while decreasing the sales of ginger ales that do not claim to be made with real ginger and those ginger ales that are truthfully offered as made with real ginger by Defendants' competitors, and/or (ii) commanding a higher price for their ginger ales because consumers will pay more for these soft drinks due to the consumers' demand for products containing real ginger because of the perceived benefits.

**Defendants Intend to Continue To Market Beverages as Being Made with "Real Ginger" that Do Not Contain Ginger.**

13

57.     Because of the growing market described above and because Defendants know consumers rely on representations about the presence of real ginger in beverages, Defendants have an incentive to continue to make such false representations. In addition, other trends suggest that Defendants have no incentive to change their labeling practices.

58.     For example, ginger ale is a particularly strong growing flavor in the healthy soda category. In December 2015, a brand manager for a competing brand, Schweppes, described ginger as a "growing flavor trend." *See* http://www.prnewswire.com/news-releases/schweppes-introduces-new-dark-ginger-ale-packed-with-a-refreshing-bolder-taste-300188635.html.

59.     Defendants are also likely seeking to diversify their beverage portfolio in response to the changing market, the booming craft soda market, and the decreased demand for traditional sodas from big manufacturers. Defendants, who have in the past acquired smaller companies that compete with their bigger brands (e.g. acquiring Blue Sky despite selling sodas under the Coca Cola and Sprite brand names), will likely desire to do the same to maintain their competitive edge and ensure they are offering ginger ales at all segments of the market.

### PLAINTIFFS' EXPERIENCES

**Plaintiff Fitzhenry-Russell's Experiences**

60.     Plaintiff Fitzhenry-Russell made several purchases of the Product from Safeway, located in Santa Cruz, CA, and a Lucky, located in Capitola, CA. She made each of her purchases of the Product after reading and relying on the truthfulness of Defendants' product label that promised that the Products were "Made with Real Ginger." Ms. Fitzhenry-Russell believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. Ms. Fitzhenry-Russell has long known that ginger root is a natural remedy, and that it can soothe an upset stomach and reduce inflammation. She believed that a product claiming to be "Made with Real Ginger" would contain enough ginger to provide the health benefits she associated with real ginger.

61.     At the time of each purchase of Seagram's, Ms. Fitzhenry-Russell did not know that the Products she purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of

Class Action Complaint

---

**Seth Safier 1/29/19 1:17 PM**
Deleted: in paragraph 45

**Unknown**
Field Code Changed

**Seth Safier 1/29/19 1:17 PM**
Deleted: <#>To capitalize on the market, Defendants may not only continue to mislead advertise the Product, but they could seek to replicate the misrepresentation in other ways. For example, Defendant currently markets a Diet Ginger Ale, but does not advertise it as being made with real ginger. Given the trends in the market, Defendant could decide it to be more profitable to start doing so. Defendants also recently purchased the small soda brands of Blue Sky and Hansen's, which both make ginger ales, and Defendants could decide to start falsely advertising those Product. Finally, Defendants own other brands of soda, such as Coca Cola, Barq's, Fanta, and for which there are a ... [1]

**Seth Safier 1/29/19 1:17 PM**
Deleted: diversity

**Seth Safier 1/29/19 1:17 PM**
Deleted: PLAINTIFF'S

**Seth Safier 1/29/19 1:17 PM**
Formatted: Font:Bold

**Seth Safier 1/29/19 1:17 PM**
Deleted: has purchased

**Seth Safier 1/29/19 1:17 PM**
Deleted: cases

**Seth Safier 1/29/19 1:17 PM**
Deleted: Over the last two years, Plaintiff ... [2]

**Seth Safier 1/29/19 1:17 PM**
Deleted: labels

**Seth Safier 1/29/19 1:17 PM**
Deleted: Product

**Seth Safier 1/29/19 1:17 PM**
Deleted: MADE WITH REAL GINGER."

**Seth Safier 1/29/19 1:17 PM**
Deleted: , Plaintiff saw, read and relied on ... [3]

**Seth Safier 1/29/19 1:17 PM**
Deleted: package

**Seth Safier 1/29/19 1:17 PM**
Deleted: the ginger ale. She was attracted t ... [4]

**Seth Safier 1/29/19 1:17 PM**
Deleted: choice, she prefers to consume so ... [5]

**Seth Safier 1/29/19 1:17 PM**
Deleted: for health benefits, namely stomac ... [6]

**Seth Safier 1/29/19 1:17 PM**
Deleted: of ginger and

**Seth Safier 1/29/19 1:17 PM**
Deleted: contain

**Seth Safier 1/29/19 1:17 PM**
Deleted: -

**Seth Safier 1/29/19 1:17 PM**
Formatted: Default Paragraph Font

**Seth Safier 1/29/19 1:17 PM**
Deleted: -

real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Ms. Fitzhenry-Russell. As a result of Defendants' misrepresentations and omissions, Ms. Fitzhenry-Russell was injured by paying more money for Seagram's than she would have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Ms. Fitzhenry-Russell would not have purchased Seagram's or would have paid a lower price for it.

62.   Ms. Fitzhenry-Russell continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Ms. Fitzhenry-Russell would likely purchase Defendants' Products again in the future. Ms. Fitzhenry-Russell regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Ms. Fitzhenry-Russell does not know the formula for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Ms. Fitzhenry-Russell will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products with the phrase "Made with Real Ginger" unless the product is actually made with ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Ms. Fitzhenry-Russell cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Ms. Fitzhenry-Russell likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Ms. Fitzhenry-Russell could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

**Plaintiff David Swartz's Experiences**

63.   Plaintiff David Swartz frequently purchased the Products in California during the class period. He made each of his purchases of the Product after reading and relying on the truthfulness of Defendants' product label that promised that the Products were "Made with Real Ginger." Mr. Swartz believed this meant that Seagram's was made with ginger root and was, as a

Class Action Complaint

result, a healthier alternative to regular sodas. Mr. Swartz purchased Seagram's ginger ale

because he believed that the real ginger in the beverage helped him and other persons in his

family with stomach related issues. He believed that a product claiming to be "Made with Real

Ginger" would contain enough ginger to provide the health benefits he associated with real

ginger.

64.     At the time of each purchase of Seagram's, Mr. Swartz did not know that the

Products he purchased were not made with real ginger, but were instead made with a miniscule

amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger.

As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a

minimum, a much lower, value to Mr. Swartz. As a result of Defendants' misrepresentations and

omissions, Mr. Swartz was injured by paying more money for Seagram's than he would have

paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Mr. Swartz would

not have purchased Seagram's or would have paid a lower price for it.

65.     Mr. Swartz continues to desire to purchase ginger ale made with real ginger,

including brands marketed and sold by Defendants. If Defendants' Products were reformulated to

be made with real ginger, i.e., made with ginger root, Mr. Swartz would likely purchase

Defendants' Products again in the future. Mr. Swartz regularly visit stores where Defendants'

Products and other ginger ale beverages are sold. Because Mr. Swartz does not know the formula

for Defendants' Products and cannot test whether or not the beverages are made with ginger root

before purchasing, Mr. Swartz will be unable to rely on Defendants' labels when shopping for

ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products

with the phrase "Made with Real Ginger" unless the product is actually made with ginger root

rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the

market, Mr. Swartz cannot know at any given time, which brands are owned by Defendants and

whether its representations about "real ginger" are truthful. Thus, Mr. Swartz is likely to be

repeatedly presented with false or misleading information when shopping for ginger ale, making

it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a

new brand of ginger ale, Mr. Swartz could be at risk for buying another one of Defendants'

Class Action Complaint

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

1    Products in reliance on the same or similar misrepresentation.

2    **Plaintiff Salcedo's Experiences**

3         66.    Plaintiff Salcedo has purchased Seagram's for years at her local Walmart, and in

4    other nearby stores in Harrisburg, Pennsylvania. She made each of her purchases of the Product

5    after reading and relying on the truthfulness of Defendants' product label that promised that the

6    Products were "Made with Real Ginger." Ms. Salcedo believed this meant that Seagram's was

7    made with ginger root and was, as a result, a healthier alternative to regular sodas. Ms. Salcedo

8    specifically purchased the Seagram's ginger ale for the health properties of ginger, i.e., helping

9    with stomach flu, cold, nausea, anti-inflammation, and digestive regulation.  She believed that a

10   product claiming to be "Made with Real Ginger" would contain enough ginger to provide the

11   health benefits she associated with real ginger.

12        67.    At the time of each purchase of Seagram's, Ms. Salcedo did not know that the

13   Products she purchased were not made with real ginger, but were instead made with a miniscule

14   amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger.

15   As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a

16   minimum, a much lower, value to Ms. Salcedo. As a result of Defendants' misrepresentations and

17   omissions, Ms. Salcedo was injured by paying more money for Seagram's than she would have

18   paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Ms. Salcedo would

19   not have purchased Seagram's or would have paid a lower price for it.

20        68.    Ms. Salcedo continues to desire to purchase ginger ale made with real ginger,

21   including brands marketed and sold by Defendants. If Defendants' Products were reformulated to

22   be made with real ginger, i.e., made with ginger root, Ms. Salcedo would likely purchase

23   Defendants' Products again in the future. Ms. Salcedo regularly visit stores where Defendants'

24   Products and other ginger ale beverages are sold. Because Ms. Salcedo does not know the

25   formula for Defendants' Products and cannot test whether or not the beverages are made with

26   ginger root before purchasing, Ms. Salcedo will be unable to rely on Defendants' labels when

27   shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling

28   its Products with the phrase "Made with Real Ginger" unless the product is actually made with

---

Class Action Complaint

---

Seth Safier 1/29/19 1:17 PM
Deleted: Product

Seth Safier 1/29/19 1:17 PM
Deleted: -

Seth Safier 1/29/19 1:17 PM
Formatted: Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
Deleted: -

ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Ms. Salcedo cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Ms. Salcedo is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Ms. Salcedo could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

**Plaintiff Miller's Experiences**

69.   Plaintiff Scott Miller was purchasing Seagram's ginger ale every month until early 2015. He made each of his purchases of the Product after reading and relying on the truthfulness of Defendants' product label that promised that the Products were "Made with Real Ginger." Mr. Miller believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. Mr. Miller stopped purchasing Seagram's in early 2015 after he tried Fever Tree ginger ale, which made him question the veracity of Defendant's "Made with Real Ginger" representation.

70.   At the time of each purchase of Seagram's, Mr. Miller did not know that the Products he purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Mr. Miller. As a result of Defendants' misrepresentations and omissions, Mr. Miller was injured by paying more money for Seagram's than he would have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Mr. Miller would not have purchased Seagram's or would have paid a lower price for it.

71.   Mr. Miller continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Mr. Miller would likely purchase Defendants' Products again in the future. Mr. Miller regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Mr. Miller does not know the formula

Seth Safier 1/29/19 1:17 PM
Deleted: -
Seth Safier 1/29/19 1:17 PM
Formatted: Default Paragraph Font
Seth Safier 1/29/19 1:17 PM
Deleted: -

18
Class Action Complaint

for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Mr. Miller will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products with the phrase "Made with Real Ginger" unless the product is actually made with ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Mr. Miller cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Mr. Miller is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Mr. Miller could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

**Plaintiff Pascual's Experiences**

72.     Plaintiff Isabelo Pascual frequently purchased two liter bottles of Seagram's from Ralph's grocery stores and 7-11 convenience stores in California during the class period. He made each of his purchases of the Product after reading and relying on the truthfulness of Defendants' product label that promised that the Products were "Made with Real Ginger." Mr. Pascual believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. He believed that a product claiming to be "Made with Real Ginger" would contain enough ginger to provide the health benefits he associated with real ginger.

73.     At the time of each purchase of Seagram's, Mr. Pascual did not know that the Products he purchased were not made with real ginger, but were instead made with a miniscule amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger. As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a minimum, a much lower, value to Mr. Pascual. As a result of Defendants' misrepresentations and omissions, Mr. Pascual was injured by paying more money for Seagram's than he would have paid. Indeed, had Defendants not misrepresented the true nature of Seagram's, Mr. Pascual would not have purchased Seagram's or would have paid a lower price for it.

---

19

Seth Safier 1/29/19 1:17 PM
**Deleted:** -
Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font
Seth Safier 1/29/19 1:17 PM
**Deleted:** -

74. Mr. Pascual continues to desire to purchase ginger ale made with real ginger, including brands marketed and sold by Defendants. If Defendants' Products were reformulated to be made with real ginger, i.e., made with ginger root, Mr. Pascual would likely purchase Defendants' Products again in the future. Mr. Pascual regularly visit stores where Defendants' Products and other ginger ale beverages are sold. Because Mr. Pascual does not know the formula for Defendants' Products and cannot test whether or not the beverages are made with ginger root before purchasing, Mr. Pascual will be unable to rely on Defendants' labels when shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products with the phrase "Made with Real Ginger" unless the product is actually made with ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the market, Mr. Pascual cannot know at any given time, which brands are owned by Defendants and whether its representations about "real ginger" are truthful. Thus, Mr. Pascual is likely to be repeatedly presented with false or misleading information when shopping for ginger ale, making it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a new brand of ginger ale, Mr. Pascual could be at risk for buying another one of Defendants' Products in reliance on the same or similar misrepresentation.

75.

**Plaintiff Carlin's Experiences**

76. Plaintiff Carlin purchased Seagram's ginger ale approximately every two weeks from the Publix grocery store in her neighborhood in Florida for the past two years. Prior to that, she would occasionally purchase Seagram's ginger ale. About two years ago, she switched from other carbonated soft drinks to Seagram's because of the "Made with Real Ginger" representation. Ms. Carlin believed this meant that Seagram's was made with ginger root and was, as a result, a healthier alternative to regular sodas. She bought Seagram's for the anti-inflammatory and stomach calming benefits associated with ingesting real ginger root. Ms. Carlin believed that a product claiming to be "Made with Real Ginger" would contain enough ginger to provide the health benefits she associated with real ginger. However, she stopped purchasing Seagram's recently when she learned the truth of the matter from news reports about litigation

Class Action Complaint

Seth Safier 1/29/19 1:17 PM
**Deleted:** -
Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font
Seth Safier 1/29/19 1:17 PM
**Deleted:** -

1   involving Canada Dry ginger ale.

2       77.     At the time of each purchase of Seagram's, Ms. Carlin did not know that the

3   Products she purchased were not made with real ginger, but were instead made with a miniscule

4   amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger.

5   As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a

6   minimum, a much lower, value to Ms. Carlin. As a result of Defendants' misrepresentations and

7   omissions, Ms. Carlin was injured by paying more money for Seagram's than she would have

8   paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Ms. Carlin would

9   not have purchased Seagram's or would have paid a lower price for it.

10      78.     Ms. Carlin continues to desire to purchase ginger ale made with real ginger,

11  including brands marketed and sold by Defendants. If Defendants' Products were reformulated to

12  be made with real ginger, i.e., made with ginger root, Ms. Carlin would likely purchase

13  Defendants' Products again in the future. Ms. Carlin regularly visit stores where Defendants'

14  Products and other ginger ale beverages are sold. Because Ms. Carlin does not know the formula

15  for Defendants' Products and cannot test whether or not the beverages are made with ginger root

16  before purchasing, Ms. Carlin will be unable to rely on Defendants' labels when shopping for

17  ginger ales in the future absent an injunction that prohibits Defendants from labeling its Products

18  with the phrase "Made with Real Ginger" unless the product is actually made with ginger root

19  rather than a miniscule amount of a ginger flavor extract. Likewise, Because of changes in the

20  market, Ms. Carlin cannot know at any given time, which brands are owned by Defendants and

21  whether its representations about "real ginger" are truthful. Thus, Ms. Carlin is likely to be

22  repeatedly presented with false or misleading information when shopping for ginger ale, making

23  it difficult to make informed purchasing decisions. Should Defendants begin to market and sell a

24  new brand of ginger ale, Ms. Carlin could be at risk for buying another one of Defendants'

25  Products in reliance on the same or similar misrepresentation.

26  **Plaintiff Hoffman's Experiences**

27      79.     Plaintiff Hoffman purchased Seagram's ginger ale approximately every two weeks

28  from the from the Acme and the Shoprite groceries stores in her neighborhood since she moved to

Seth Safier 1/29/19 1:17 PM
Deleted: -

Seth Safier 1/29/19 1:17 PM
Formatted: Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
Deleted: -

Class Action Complaint

1   New Jersey a few years ago. She typically, but not exclusively, purchased the screw top bottle

2   format, as opposed to cans.  Before that time, she would occasionally purchase Seagram's ginger

3   ale, among other ginger ales.  Shortly after she returned to New Jersey from California a few

4   years ago, she switched from other carbonated soft drinks to Seagram's because of the "Made

5   with Real Ginger" representation. Ms. Hoffman believed this meant that Seagram's was made

6   with ginger root and was, as a result, a healthier alternative to regular sodas. She bought

7   Seagram's for herself and for her two young daughters based upon the anti-inflammatory and

8   stomach calming benefits associated with ingesting real ginger root. Ms. Hoffman believed that a

9   product claiming to be "Made with Real Ginger" would contain enough ginger to provide the

10   health benefits she associated with real ginger. However, she stopped purchasing Seagram's

11   recently when she learned the truth of the matter from news reports about litigation involving

12   Canada Dry ginger ale.

13         80.   At the time of each purchase of Seagram's, Ms. Hoffman did not know that the

14   Products she purchased were not made with real ginger, but were instead made with a miniscule

15   amount of a ginger flavor extract, which does not provide any of the health benefits of real ginger.

16   As a result of Defendants' misrepresentations and omissions, the Products have no, or, at, a

17   minimum, a much lower, value to Ms. Hoffman. As a result of Defendants' misrepresentations

18   and omissions, Ms. Hoffman was injured by paying more money for Seagram's than she would

19   have paid. Indeed, had Defendants not mispresented the true nature of Seagram's, Ms. Hoffman

20   would not have purchased Seagram's or would have paid a lower price for it.

21         81.   Ms. Hoffman continues to desire to purchase ginger ale made with real ginger,

22   including brands marketed and sold by Defendants. If Defendants' Products were reformulated to

23   be made with real ginger, i.e., made with ginger root, Ms. Hoffman would likely purchase

24   Defendants' Products again in the future. Ms. Hoffman regularly visit stores where Defendants'

25   Products and other ginger ale beverages are sold. Because Ms. Hoffman does not know the

26   formula for Defendants' Products and cannot test whether or not the beverages are made with

27   ginger root before purchasing, Ms. Hoffman will be unable to rely on Defendants' labels when

28   shopping for ginger ales in the future absent an injunction that prohibits Defendants from labeling

Class Action Complaint

Seth Safier 1/29/19 1:17 PM
**Formatted:** Tabs: 0.5", Left +  1.44", Left

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

1   its Products with the phrase "Made with Real Ginger" unless the product is actually made with

2   ginger root rather than a miniscule amount of a ginger flavor extract. Likewise, Because of

3   changes in the market, Ms. Hoffman cannot know at any given time, which brands are owned by

4   Defendants and whether its representations about "real ginger" are truthful. Thus, Ms. Hoffman is

5   likely to be repeatedly presented with false or misleading information when shopping for ginger

6   ale, making it difficult to make informed purchasing decisions. Should Defendants begin to

7   market and sell a new brand of ginger ale, Ms. Hoffman could be at risk for buying another one of

8   Defendants' Products in reliance on the same or similar misrepresentation.

9                                    **CLASS ALLEGATIONS**

10      82.    Plaintiff brings this action against Defendants, on behalf of herself and all others

11   similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

12   Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

13          All persons who, between December 23, 2012 and the present, purchased any
           of the Defendants' Product (the "Nationwide Class").

14      83.    Plaintiffs also seek certification of the following subclass: all members of the

15   Nationwide Class who made their purchases in Alabama, Arizona, California, Connecticut,

16   Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky,

17   Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana,

18   Nebraska, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania,

19   Rhode Island, South Carolina, Vermont, Washington, West Virginia, or Wyoming (the

20   "Consumer Unfairness/Unlawfulness Subclass").

21      84.    Plaintiffs Fitzhenry-Russell, Swartz, and Pascual also seek to represent a subclass

22   of those members of the Nationwide Class who purchased any of Defendants' Products in

23   California (the "California Subclass").

24      85.    Plaintiff Salcedo also seeks to represent a subclass of those members of the

25   Nationwide Class who purchased any of Defendants' Products in Pennsylvania (the

26   "Pennsylvania Subclass").

27      86.

28      87.    Plaintiff Hoffman also seeks to represent a subclass of those members of the

23

Class Action Complaint

---

Seth Safier 1/29/19 1:17 PM
**Deleted:** section 1781

Seth Safier 1/29/19 1:17 PM
**Deleted:** California

Seth Safier 1/29/19 1:17 PM
**Deleted:** Code. Plaintiff

Seth Safier 1/29/19 1:17 PM
**Formatted:** Body Text,bt,Body Text rt margin,Ctrl+1,Body Text - 1",Body,m, Justified, Indent: Left:  0.75", Right:  0.55", Space Before:  6 pt, Line spacing:  single, No bullets or numbering, Tabs: 0", Left + 1", List tab + Not at  0.5" +  1.5" +  3"

Seth Safier 1/29/19 1:17 PM
**Deleted:** the

Seth Safier 1/29/19 1:17 PM
**Deleted:** This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in

Seth Safier 1/29/19 1:17 PM
**Deleted:** litigation and the proposed class is easily ascertainable.

Seth Safier 1/29/19 1:17 PM
**Deleted:** <#>Numerosity:  Plaintiff does not know the exact size the Class, but they are estimated that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts. ¶

Seth Safier 1/29/19 1:17 PM
**Deleted:** ¶

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** ¶

Nationwide Class who purchased any of Defendants' Products in New Jersey (the "New Jersey Subclass").

88.   Plaintiffs Miller and Carlin also seek to represent a subclass of those members of the Nationwide Class who purchased any of Defendants' Products in Florida (the "Florida Subclass").

89.   The Nationwide Class, as well as the Subclasses are referred to collectively as the "Classes."

90.   Plaintiffs reserve the right to propose additional or further subclasses or narrowing of the above class and subclass definitions, based on the evidence adduced in discovery, or as necessary and appropriate.

91.   In each of the causes of action pled below, a statement that the count is alleged on behalf of a particular class or subclass includes all subclasses thereof, including subclasses that may later be proposed as described in the prior paragraph.

92.   Plaintiffs and members of the Classes have been economically damaged by their purchase of Seagram's because the advertising for Seagram's was and is untrue and/or misleading under applicable law; therefore, Seagram's is worth less than what Plaintiffs and members of the Classes paid for it and/or Plaintiff and members of the Classes did not receive what they reasonably intended to receive.

93.   As a direct and proximate result of Defendants' unfair and wrongful conduct, as set forth herein, Plaintiffs and class members: (1) were misled into purchasing Seagram's; (2) received a product that failed to meet their reasonable expectations and Defendants' promises; (3) paid a premium sum of money for a product that was not as represented and, thus, were deprived of the benefit of the bargain because the purchased ginger ale had less value than what was represented by Defendants; and (4) ingested a substance that was other than what was represented by Defendants and that Plaintiff and class members did not expect.

94.   This action is properly brought and may be maintained as a class action because it satisfies all of the prerequisites of Rule 23.

95.   Numerosity:  Plaintiffs do not know the exact size the Classes, but they far exceed

Class Action Complaint

1   100 persons. The persons in the Classes are so numerous that the joinder of all such persons is

2   impracticable and the disposition of their claims in a class action rather than in individual actions

3   will benefit the parties and the courts.

4          96.     Typicality: Named Plaintiffs are all typical of the Classes because they were

5   subject to the same fraudulent scheme of Defendants as every other class member. They

6   purchased Seagram's based on Defendants' false representation that it was "Made from Real

7   Ginger." They, like all other class members, paid a premium as a result of that misrepresentation

8   and suffered economic injury as a result. Thus, Plaintiffs and the class members sustained the

9   same injuries and damages arising out of Defendants' conduct in violation of the law.  The

10  injuries and damages of each class member were caused directly by Defendants' wrongful

11  conduct in violation of law as alleged.

12         97.     Adequacy:  Plaintiffs will fairly and adequately protect the interests of all class

13  members because it is in their best interests to prosecute the claims alleged herein to obtain full

14  compensation due to them for the unfair and illegal conduct of which they complain.  Plaintiffs

15  have no interests that are in conflict with, or antagonistic to, the interests of class members.

16  Plaintiffs have retained highly competent and experienced class action attorneys to represent their

17  interests and that of the class. By prevailing on their own claims, Plaintiffs will establish

18  Defendants' liability to all class members.  Plaintiffs and their counsel have the necessary

19  financial resources to adequately and vigorously litigate this class action, and Plaintiffs and

20  counsel are aware of their fiduciary responsibilities to the class members and are determined to

21  diligently discharge those duties by vigorously seeking the maximum possible recovery for class

22  members.

23         98.     Commonality and Predominance: This action involves common questions the

24  common answers of which will drive the resolution of this case for all class members because

25  each class member's claim derives from the deceptive, unlawful and/or unfair statements and

26  omissions that led consumers to believe that Seagram's was made using ginger root. Defendants'

27  product label was the same on all Seagram's products throughout the class period. Its formula

28  likewise remained unchanged. Thus, all of the central issues in this case will be resolved via

Class Action Complaint

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

common proof for all class members, establishing that common issues predominate over any individual issues. The questions of law and fact common to the Classes are:

a) whether the Product is "Made with Real Ginger;"

b) whether Defendants unfairly, unlawfully and/or deceptively misrepresented that the Product is "Made with Real Ginger;"

c) whether the use of the phrase "Made with Real Ginger" on the primary display panel of the Product violated Federal and/or California state law;

d) whether the advertising of the product as Made with Real Ginger causes it to command a premium in the market as compared with similar products that do not make such a claim;

e) whether Defendants' advertising and marketing regarding the Product sold to the class members was likely to deceive the class members and/or was unfair;

f) Whether a "Made with Real Ginger" claim on product packaging and advertising is material to a reasonable consumer;

g) whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

h) the amount of profits and revenues earned by Defendants as a result of the conduct;

i) whether class members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

j) whether class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

99.    Superiority:  There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendants and result in the

26

---

Seth Safier 1/29/19 1:17 PM
**Deleted:** MADE WITH REAL GINGER;"

Seth Safier 1/29/19 1:17 PM
**Deleted:** MADE WITH REAL GINGER;"

Seth Safier 1/29/19 1:17 PM
**Deleted:** MADE WITH REAL GINGER

Seth Safier 1/29/19 1:17 PM
**Deleted:** MADE WITH REAL GINGER

Seth Safier 1/29/19 1:17 PM
**Deleted:** <#>Typicality: Plaintiff's claims are typical of the Class because she purchased at least eight cases of the Product – in reliance on Defendants' misrepresentations and that they were "MADE WITH REAL GINGER." Thus, Plaintiff and the class members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law.  The injuries and damages of each class member were caused directly by Defendants' wrongful conduct in violation of law as alleged. ¶
<#>Adequacy:  Plaintiff will fairly and adequately protect the interests of all class members because it is in her best interests to prosecute the claims alleged herein to obtain full compensation due to her for the unfair and illegal conduct of which she complains.  Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of class members.  Plaintiff has retained highly competent and experienced class action attorneys to represent her interests and that of the classes.  By prevailing on her own claims, Plaintiff will establish Defendants' liability to all class members.  Plaintiff and her counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members. ¶

Seth Safier 1/29/19 1:17 PM
**Formatted:** Underline

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

100.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

Plaintiffs do not plead, and hereby disclaim, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

### PLAINTIFFS' FIRST CAUSE OF ACTION
*(Violation of the Consumer Protection Acts of 50 States and the District of Columbia, Including, without limitation, the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, et seq.)*
**On Behalf of the Nationwide Class**

101.    Plaintiffs reallege and incorporates the above paragraphs of this Complaint as if fully set forth herein.

102.    Plaintiffs bring this claim on behalf of the Classes for violation of the consumer protection acts of each of the States of the United States, and the District of Columbia.

103.    Plaintiffs bring these statutory consumer protection claims pursuant to the substantially similar "Consumer Protection Acts" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices.

104.    The following consumer protection acts are collectively referred to herein as the

27

Class Action Complaint

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff does not

Seth Safier 1/29/19 1:17 PM
**Deleted:** s

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff relies

Seth Safier 1/29/19 1:17 PM
**Deleted:** PLAINTIFF'S

Seth Safier 1/29/19 1:17 PM
**Formatted:** Normal, None, Widow/Orphan control, Don't keep with next, Tabs:Not at 0.5" + 1" + 1.5" + 3"

Seth Safier 1/29/19 1:17 PM
**Deleted:**

Seth Safier 1/29/19 1:17 PM
**Formatted:** Font:Not Bold, Italic

Seth Safier 1/29/19 1:17 PM
**Formatted:** Font:Not Bold, Italic

Seth Safier 1/29/19 1:17 PM
**Formatted:** Font:Not Bold

Seth Safier 1/29/19 1:17 PM
**Formatted:** Font:Not Bold, Italic

Seth Safier 1/29/19 1:17 PM
**Formatted:** Font:Italic

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff and the

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff realleges and incorporate the

Seth Safier 1/29/19 1:17 PM
**Formatted:** Tabs: 1.44", Left

Seth Safier 1/29/19 1:17 PM
**Deleted:** Class Action

Seth Safier 1/29/19 1:17 PM
**Deleted:** <#>Defendants' actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers. ¶
<#>Plaintiff and other class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d). ¶
<#>The Product that Plaintiff (and other similarly situated class members) purchased from Defendants were "goods" within the meaning of California Civil Code § 1761(a). ¶
<#>Defendants' acts and practices, set forth in this Class Action Complain, led customers to falsely believe that the Product were made with, and contained, real ginger.  By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendants have violated, and continues to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), § 1770(a)(8), and § 1770(a)(9) of the CLRA. In violation of California Civil Code    [... [7]

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

"Consumer Protection Acts":

    a.    ALA. CODE § 8-19-1 et seq. (Alabama);

    b.    ALASKA STAT. ANN. § 45.50.471 et seq. (Alaska);

    c.    ARIZ. REV. STAT. ANN. § 44-1521 et seq. (Arizona);

    d.    ARK. CODE ANN. § 4-88-101 et seq. (Arkansas);

    e.    CAL. CIV. CODE § 1750 et seq. (California);

    f.    COLO. REV. STAT. ANN. § 6-1-101 et seq. (Colorado);

    g.    CONN. GEN. STAT. ANN. § 42-110a et seq. (Connecticut);

    h.    DEL. CODE ANN. tit. 6, § 2511 et seq. (Delaware);

    i.    D.C. CODE ANN. § 28-3901 et seq. (District of Columbia);

    j.    FLA. STAT. ANN. § 501.201 et seq. (Florida);

    k.    GA. CODE ANN. § 10-1-370 et seq. and GA. CODE ANN. § 10-1-390 et seq. (Georgia);

    l.    HAW. REV. STAT. ANN. § 480-1 et seq. and HAW. REV. STAT. ANN. § 481A-1 et seq. (Hawai'i);

    m.    IDAHO CODE ANN. § 48-601 et seq. (Idaho);

    n.    815 ILCS 505/1 et seq. (Illinois);

    o.    IND. CODE ANN. § 24-5-0.5-0.1 et seq. (Indiana);

    p.    IOWA CODE § 714.16 et seq.

    q.    KAN. STAT. ANN. § 50-623 et seq. (Kansas);

    r.    KY. REV. STAT. ANN. § 367.110 et seq. (Kentucky);

    s.    LA. STAT. ANN. § 51:1401 et seq. (Louisiana);

    t.    ME. REV. STAT. tit. 5, § 205-A et seq. (Maine);

    u.    MD. CODE ANN., COM. LAW § 13-101 et seq. (Mary-land);

    v.    MASS. GEN. LAWS ANN. ch. 93A, § 1 et seq. (Massachusetts);

    w.    MICH. COMP. LAWS ANN. § 445.901 et seq. (Michigan);

Seth Safier 1/29/19 1:17 PM
**Deleted:** -
Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font
Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Class Action Complaint

1     x.     MINN. STAT. ANN. § 325F.68 et seq., MINN. STAT. ANN. § 325D.09 et
seq., MINN. STAT. ANN. § 325D.43 et seq., and MINN. STAT. ANN. §
2          325F.67 (Minnesota);

3     y.     MISS. CODE ANN. § 75-24-1 et seq. (Mississippi);

4     z.     MO. ANN. STAT. § 407.010 et seq. (Missouri);

5     aa.    MONT. CODE ANN. § 30-14-101 et seq. (Montana);

6     bb.    NEB. REV. STAT. ANN. § 59-1601 et seq. (Nebraska);

7     cc.    NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN.
§598.0903 et seq. (Nevada);
8

9     dd.    N.H. REV. STAT. ANN. § 358-A:1 et seq. (New Hampshire);

10    ee.    N.J. STAT. ANN. § 56:8-1 et seq. (New Jersey);

11    ff.    N.M. STAT. ANN. § 57-12-1 et seq. (New Mexico);

12    gg.    N.Y. GEN. BUS. LAW. § 349 et seq. (New York);

13    hh.    N.C. GEN. STAT. ANN. § 75-1 et seq. (North Carolina);

14    ii.    N.D. CENT. CODE ANN. § 51-15-01 et seq. (North Dakota);

15    jj.    OHIO REV. CODE ANN. § 1345.01 et seq. (Ohio);

16    kk.    OKLA. STAT. ANN. tit. 15, § 751 et seq. (Oklahoma);

17    ll.    OR. REV. STAT. ANN. § 646.605 et seq. (Oregon);

18    mm.    73 PA. STAT. ANN. § 201-1 et seq. (Pennsylvania);

19    nn.    6 R.I. GEN. LAWS ANN. § 6-13.1-1 et seq. (Rhode Island);

20    oo.    S.C. CODE ANN. § 39-5-10 et seq. (South Carolina);

21    pp.    S.D. CODIFIED LAWS § 37-24-1 et seq. (South Dakota);

22    qq.    TENN. CODE ANN. § 47-18-101 et seq. (Tennessee);

23    rr.    TEX. BUS. & COM. CODE ANN. § 17.41 et seq. (Texas);

24    ss.    UTAH CODE ANN. § 13-11-1 et seq. (Utah);

25    tt.    VT. STAT. ANN. tit. 9, § 2451 et seq. (Vermont);

26    uu.    VA. CODE ANN. § 59.1-196 et seq. (Virginia);

27    vv.    WASH. REV. CODE ANN. § 19.86.010 et seq. (Washing-ton);

28

Class Action Complaint

Seth Safier 1/29/19 1:17 PM
**Deleted:** -
Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font
Seth Safier 1/29/19 1:17 PM
**Deleted:** -

ww.   W.VA. CODE ANN. § 46A-6-101 et seq. (West Virginia);

xx.   WIS. STAT. ANN. § 100.20 (Wisconsin); and

yy.   WYO. STAT. ANN. § 40-12-101 et seq. (Wyoming).

105.   Plaintiffs and members of the Classes have standing to assert claims under the Consumer Protection Acts because they are consumers within the meaning of the Consumer Protection Acts and Defendants' practices were addressed to the market generally and otherwise implicate consumer protection concerns.

106.   Defendants have engaged in and continue to engage in the unfair, unlawful and deceptive trade practices outlined in this Class Action Complaint.

107.   Throughout the class period, Defendants have unfairly and deceptively advertised and represented to Plaintiffs and class members that Seagram's was "Made with Real Ginger." But Defendants failed to inform Plaintiffs and class members that Seagram's was not made with real ginger but was instead made from a flavoring compound containing a miniscule amount of a ginger flavor extract, which was present in quantities too small to impart flavor to the beverage or provide any health benefits.

108.   Defendants intended for Plaintiffs and the Class members to rely on the unlawful, fraudulent, and/or unfair business acts and practices alleged herein.

109.   Plaintiffs and those similarly situated relied to their detriment on Defendants' unfair, deceptive and unlawful business practices.  Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by not purchasing (or paying less for) Defendants' Products.

110.   Defendants' acts and omissions are likely to deceive the general public.

111.   Defendants' actions, which were knowing, willful, and wanton, constitute intentional violations of the Consumer Protection Acts.

112.   Defendants engaged in these unfair practices to increase profits.

113.   Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by the Consumer protection Acts.

114.   The aforementioned practices, which Defendants have used to their significant

Seth Safier 1/29/19 1:17 PM
Deleted: -
Seth Safier 1/29/19 1:17 PM
Formatted: Default Paragraph Font
Seth Safier 1/29/19 1:17 PM
Deleted: -

Class Action Complaint

financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

115.     Plaintiffs seek, on behalf of those similarly situated, full damages, as necessary and according to proof, to restore any and all monies acquired from Plaintiffs, the general public, or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon. Plaintiffs also seek to recover attorneys' fees, costs, and expenses to be assessed against Defendants, within the limits set forth by applicable law.

116.     Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein.

117.     Plaintiffs and those similarly situated are further entitled to and do seek both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent, and injunctive relief restraining Defendants from engaging in any of such deceptive, unfair and/or unlawful trade practices in the future.  Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate Consumer Protection Acts, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled.  Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the Consumer Protection Acts alleged to have been violated herein.

118.      As a direct and proximate result of such actions, Plaintiffs and the other members of the Classes have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the Classes lost the amount they paid for the Products.

119.      As a direct and proximate result of such actions, Defendants have enjoyed, and

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Class Action Complaint

1   continue to enjoy, significant financial gain in an amount which will be proven at trial, but which
2   is in excess of the jurisdictional minimum of this Court.

3        120.  Plaintiffs also requests that this Court award her costs and reasonable attorneys'
4   fees pursuant to the Consumer Protection Acts.

5        121.  On December 29, 2016, Plaintiffs delivered a demand letter to Defendants by
6   mailing, certified mail, return receipt requested, a demand letter to Defendant and its registered
7   agent. Defendant acknowledged receipt on January 12, 2017.

8        122.  The letters described the above-referenced unfair and deceptive acts and practices,
9   set forth the nature of Plaintiff's and the Classes' injury, and requested relief from Defendants
10  within 30 days.

11       123.  Defendants did not respond to the letters within 30 days nor did Defendants tender
12  any offer of settlement or other form of relief.

13       124.  The demand letters satisfy any notification or presentment requirements under the
14  Consumer Protection Acts.

15       125.  Alternatively, providing notice to Defendants would have been futile in light of
16  Defendants' non-response to these letters, and Defendants' failure to change its label despite
17  nearly two years of litigation in California.

18  **PLAINTIFFS' SECOND CAUSE OF ACTION**
    *(Fraud, Deceit and/or Misrepresentation)*
19  **On Behalf of the Nationwide Class**

20       126.  Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action
21  Complaint as if set forth herein.

22       127.  Throughout the last four years, at weekly and monthly intervals, Defendants
23  fraudulently and deceptively informed Plaintiffs and class members that the Products were "Made
24  with Real Ginger." But Defendants failed to inform Plaintiffs and class members that Seagram's
25  was not made with real ginger but was instead made from a flavoring compound containing a
26  miniscule amount of a ginger flavor extract, which was present in quantities too small to impart
27  flavor to the beverage or provide any health benefits.

28       128.  These misrepresentations and omissions were known exclusively to, and actively

32

*Seth Safier 1/29/19 1:17 PM*
**Deleted:** California Civil Code § 1780(d).
*Seth Safier 1/29/19 1:17 PM*
**Deleted:** PLAINTIFFS

*Seth Safier 1/29/19 1:17 PM*
**Deleted:** -
*Seth Safier 1/29/19 1:17 PM*
**Formatted:** Default Paragraph Font
*Seth Safier 1/29/19 1:17 PM*
**Deleted:** -

concealed by, Defendants, not reasonably known to Plaintiff, and material at the time they were made. Defendants knew the composition of the Product, and they knew that the soft drinks were made with a flavour compound containing miniscule amount of ginger flavor extracts, not ginger root. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs as to whether to purchase Defendants' ginger ales.  In misleading Plaintiffs and not so informing Plaintiffs, Defendants breached their duty to them. Defendants also gained financially from, and as a result of, their breach.

129.   Plaintiff and those similarly situated relied to their detriment on Defendants' misrepresentations and fraudulent omissions.  Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Product, (ii) purchasing less of them, or (iii) paying less for the Product.

130.   By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiff and those similarly situated to alter their position to their detriment.  Specifically, Defendants fraudulently and deceptively induced Plaintiff and those similarly situated to, without limitation, to purchase the Product.

131.   Plaintiff and those similarly situated justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants.

132.   As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiff and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Product.

133.   Defendants' conduct as described herein was wilful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiff and those similarly situated.

**PLAINTIFFS' THIRD CAUSE OF ACTION**
*(False Advertising, Business and Professions Code § 17500, et seq. ("FAL"))*
**On Behalf the California Subclass**

134.   Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

33

135.     Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendants made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Product.

136.     Defendants made representations and statements (by omission and commission) that led reasonable customers to believe that the Product that they were purchasing were made with, and contained, real ginger root.

137.     Plaintiffs and those similarly situated relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth in paragraphs 19-22, 29-39, and 50-55 above.  Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation, refraining from purchasing Defendants' ginger ales or paying less for them.

138.     Defendants' acts and omissions are likely to deceive the general public.

139.     Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits.  Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

140.     The aforementioned practices, which Defendants used, and continue to use, to their significant financial gain, also constitutes unlawful competition and provides an unlawful advantage over Defendants' competitors as well as injury to the general public.

141.     As a direct and proximate result of such actions, Plaintiffs and the other class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

142.     Plaintiffs seeks, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus

34
Class Action Complaint

interest thereon.

143.   Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

144.   Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they are not entitled.  Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFFS' FOURTH CAUSE OF ACTION**
*(Unlawful, unfair, and fraudulent trade practices in violation of Business and Professions Code § 17200, et seq. and similar state laws)*
**On Behalf of the Consumer Unfairness/Unlawfulness Subclass**

145.   Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

146.   Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendants have engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California and other states by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

147.   In particular, Defendants have engaged, and continue to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the Consumer Protection Acts of every state; (iv) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (v) the misbranded

35

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff

Seth Safier 1/29/19 1:17 PM
**Deleted:** herself

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff seeks

Seth Safier 1/29/19 1:17 PM
**Deleted:** herself

Seth Safier 1/29/19 1:17 PM
**Deleted: PLAINTIFF'S THIRD**

Seth Safier 1/29/19 1:17 PM
**Formatted:** Font:Arial, 11 pt, Bold,

Seth Safier 1/29/19 1:17 PM
**Deleted: (Fraud, Deceit and/or Misrepresentation)** .

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff and

Seth Safier 1/29/19 1:17 PM
**Deleted:** Class

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff realleges

Seth Safier 1/29/19 1:17 PM
**Deleted:** <#>Throughout the last four years, at weekly and monthly intervals, Defendants fraudulently and deceptively informed Plaintiff that the Product was "MADE WITH REAL GINGER." Further, at weekly and monthly intervals over the last four years, Defendants failed to inform Plaintiff that the Product was not made with real ginger but instead were made from a chemical compound manufactured to mimic the flavor of ginger. ¶ <#>These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendants, not reasonably known to Plaintiff, and material at the time they were made. Defendants knew the composition of the Product, and they knew that the soft drinks were flavored with a chemical compound intended to mimic the taste of ginger. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase Defendants' ginger ales.  In misleading Plaintiffs and not so informing Plaintiff, Defendants breached their duty to her. Defendants also gained financially from, and as a result of, their breach. . ¶ <#>Plaintiff and those similarly situated relied to their detriment on Defendants' misrepresentations and fraudulent omissions.  Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Product, (ii) purchasing less of them, or (iii) paying less for the Product. . ¶ <#>By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiff and those similarly situated to alter their position to their detriment. Specifically, Defendants fraudulently and ... [8]

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110740, 110760, 110765, and 110770; and (vi) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. 101.3, 101.4, 101.13, 101.14, and 101.22, which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

148.    In particular, Defendants have engaged, and continue to engage, in unfair and fraudulent practices by, without limitation, the following: (i) misrepresenting that the Product is "made with real ginger;" and (ii) failing to inform Plaintiff, and those similarly situated, that the Products that they purchased are made with a flavor compound manufactured to mimic the taste of ginger by using miniscule amounts of ginger flavour extracts, rather than real ginger root.

149.    Plaintiff and those similarly situated relied to their detriment on Defendants' unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by Defendants, they would have acted differently by, without limitation: (i) declining to purchase the Product, (ii) purchasing less of the Product, or (iii) paying less for the Product.

150.    Defendants' acts and omissions are likely to deceive the general public.

151.    Defendants engaged in these deceptive and unlawful practices to increase their profits.  Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

152.    The aforementioned practices, which Defendants have used to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

153.    As a direct and proximate result of such actions, Plaintiff and the other class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the class members lost the amount they paid for the Product.

Seth Safier 1/29/19 1:17 PM
**Deleted:** its

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Class Action Complaint

154.     As a direct and proximate result of such actions, Defendants have enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

155.     Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, or those similarly situated by means of the deceptive and/or unlawful trade practices complained of herein, plus interest thereon.

156.     Plaintiffs seek, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

157.     Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit Defendants from continuing to engage in the deceptive and/or unlawful trade practices complained of herein.  Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which they were not entitled.  Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFFS' FIFTH CAUSE OF ACTION**

*(Unjust Enrichment)*

**On Behalf of the Nationwide Class**

158.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

159.     By means of Defendant's wrongful conduct alleged herein, Defendant knowingly caused Seagram's to be sold to Plaintiffs and members of the Nationwide Class in a manner that was unfair, unconscionable, and oppressive.

37

Class Action Complaint

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff seeks

Seth Safier 1/29/19 1:17 PM
**Deleted:** herself

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff seeks

Seth Safier 1/29/19 1:17 PM
**Deleted:** Plaintiff seeks

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

160.    Defendant knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Nationwide Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Nationwide Class.

161.    As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Nationwide Class.

162.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

163.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, without justification, from causing Seagram's to be sold to Plaintiffs and members of the Nationwide Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

164.    The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Nationwide Class. Defendant should be compelled to return in a common fund for the benefit of Plaintiffs and members of the Nationwide Class all wrongful or inequitable proceeds received by them.

165.    Plaintiffs and members of the Nationwide Class have no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and those similarly situated, respectfully requests that the Court enter judgment against Defendants as follows:

A.  Certification of the proposed Nationwide Class, and California, Pennsylvania, New York, New Jersey, and Florida Subclasses, including appointment of Plaintiff's counsel as class counsel;

B.  An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.  An award of compensatory damages in an amount to be determined at trial;

38

Class Action Complaint

D. An award of statutory damages in an amount to be determined at trial;

E. An award of punitive damages in an amount to be determined at trial;

F. An award of treble damages;

G. An award of restitution in an amount to be determined at trial;

H. An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded;

I. For reasonable attorney's fees and the costs of suit incurred;

J. For such further relief as this Court may deem just and proper;

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 29, 2018 **GUTRIDE SAFIER LLP**

Adam J. Gutride, Esq.
Seth A. Safier, Esq.
Marie A. McCrary, Esq.
Matthew T. McCrary, Esq.
100 Pine Street, Suite 1250
San Francisco, CA 94111

Attorneys for Plaintiff

Seth Safier 1/29/19 1:17 PM
**Formatted:** Font:Times New Roman, 12 pt, Not Bold, Not All caps

Seth Safier 1/29/19 1:17 PM
**Formatted:** Font:Times New Roman, 12 pt, Not Bold, English (US), Not All caps

Seth Safier 1/29/19 1:17 PM
**Formatted:** _HEADING, Numbered + Level: 1 + Numbering Style: A, B, C, ... + Start at: 1 + Alignment: Left + Aligned at: 0.5" + Indent at: 0.75", Tabs:Not at 0.5" +

Seth Safier 1/29/19 1:17 PM
**Deleted:** the purposes of this paragraph, "means and instrumentalities" means any information, including, but not necessarily limited to, any advertising, labeling, or promotional, sales training, or purported substantiation materials, for use by trade customers in their marketing of such product or service.
B. On Cause of Action Number 1 (for violation of the Consumers Legal Remedies Act) against Defendants and in favor of Plaintiffs and the other members of the Class as follows:
1. An award of actual damages, the amount of which is to be determined at trial ... [10]

Seth Safier 1/29/19 1:17 PM
**Deleted:** attorneys'

Seth Safier 1/29/19 1:17 PM
**Deleted:** according to proof pursu ... [11]

Seth Safier 1/29/19 1:17 PM
**Deleted:** California Legal Remed ... [12]

Seth Safier 1/29/19 1:17 PM
**Deleted:** AND

Seth Safier 1/29/19 1:17 PM
**Formatted** ... [13]

Seth Safier 1/29/19 1:17 PM
**Formatted** ... [14]

Seth Safier 1/29/19 1:17 PM
**Formatted** ... [15]

Seth Safier 1/29/19 1:17 PM
**Formatted** ... [16]

Seth Safier 1/29/19 1:17 PM
**Deleted:** .

Seth Safier 1/29/19 1:17 PM
**Formatted:** Font:Not Bold

Seth Safier 1/29/19 1:17 PM
**Deleted:** 5

Seth Safier 1/29/19 1:17 PM
**Deleted:** <sp>

Seth Safier 1/29/19 1:17 PM
**Deleted:** _ /

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

Seth Safier 1/29/19 1:17 PM
**Formatted:** Default Paragraph Font

Seth Safier 1/29/19 1:17 PM
**Deleted:** -

# Exhibit 3

HIGHLY CONFIDENTIAL

Page 1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3               SAN JOSE DIVISION

4                    -oOo-

5

6

7    JACKIE FITZHENRY-RUSSELL,     )
                                   )
8                  Plaintiff,      )
                                   )
9       vs.                        )  Case No:  5:17-cv-00603-EJD
                                   )
10   THE COCA-COLA COMPANY,        )
                                   )
11                 Defendants.     )
     _____)

12

13

14

15

16

17              ** HIGHLY CONFIDENTIAL **

18      VIDEOTAPED DEPOSITION OF JACKIE FITZHENRY-RUSSELL

19              San Francisco, California

20           Thursday, September 27, 2018

21

22   Reported by:

23   LISA R. TOW

24   CSR No. 6629

25

HIGHLY CONFIDENTIAL

Page 2

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4                         -oOo-
 5
 6
 7   JACKIE FITZHENRY-RUSSELL,      )
                                    )
 8               Plaintiff,         )
                                    )
 9      vs.                         )  Case No:  5:17-cv-00603-EJD
                                    )
10   THE COCA-COLA COMPANY,         )
                                    )
11               Defendants.        )
     _____ )
12
13
14
15          Deposition of JACKIE FITZHENRY-RUSSELL, taken on
16   behalf of Defendant, at the Offices of Shook Hardy & Bacon
17   1 Montgomery St #2700, San Francisco, California, 94104,
18   beginning at 10:09 A.M. and ending at 2:37 p.m. on Thursday,
19   September 27, 2018, before LISA R. TOW, Certified Shorthand
20   Reporter No. 6629.
21
22
23
24
25
```

HIGHLY CONFIDENTIAL

```
                                                    Page 93
 1   ginger ale before you buy it?
 2        A.   I do now.
 3        Q.   When did that practice start?
 4        A.   2014.
 5        Q.   Why did you start doing that in 2014?
 6        A.   Because it says -- it says "made with real
 7   ginger."  But, if you turn it around, the Canada
 8   Dry, on the back of it, it doesn't have ginger in
 9   the ingredients.
10        Q.   So, you started in 2014, looking at the
11   ingredient list on Canada Dry?
12        A.   Yeah.
13        MR. SAFIER:  Jackie, you have to give me a sec.
14        Misstates prior testimony.  Lacks foundation.
15        BY MS. COHEN:
16        Q.   And was it in 2014 that you discovered
17   that there was no ginger in Canada Dry?
18        MR. SAFIER:  Lacks foundation.  Misstates prior
19   testimony.
20        THE WITNESS:  Yes.
21        BY MS. COHEN:
22        Q.   But, you continued to purchase it after
23   2014?
24        A.   No.
25        Q.   So you stopped purchasing Canada Dry in
```

HIGHLY CONFIDENTIAL

Page 102

1      MR. SAFIER:  Yes.

2      THE WITNESS:  Yeah.  I think.

3      Do it again.

4      BY MS. COHEN:

5      Q.   Sitting here today, you cannot recall,

6  specifically, whether you saw the "made with real

7  ginger" claim on that one pack that you purchased in

8  2014, when you first bought it?

9      MR. SAFIER:  Lacks foundation.  Misstates prior

10  testimony.

11      THE WITNESS:  Yes.  I think that it did.  But,

12  I can't absolutely say.

13      MR. SAFIER:  Can we take a break?

14      MS. COHEN:  Sure.

15      THE VIDEOGRAPHER:  Going off the record.

16      The time is 11:58 a.m.

17          (Whereupon a break was had)

18      THE VIDEOGRAPHER:  Back on the record.

19      The time is 12:13 p.m.

20      BY MR. COHEN:

21      Q.   Mrs. Russell, during the break did you

22  speak to your lawyer about the substance of your

23  testimony?

24      MR. SAFIER:  I am going to caution you that you

25  can answer this question, but you are not to tell

Page 104

1  please.

2         THE WITNESS:  Okay.

3         BY MS. COHEN:

4         Q.   Can you answer the question?

5         A.   Can you state it again?

6         MR. SAFIER:  She answered it.

7         BY MS. COHEN:

8         Q.   You're testifying now, if I understand it,

9  that you must have looked at the front of the

10  cardboard box that was enclosing the 12 cans of

11  ginger ale; is that right?

12        A.   Right.

13        Q.   Do you actually remember looking at that

14  cardboard box?

15        A.   Well, I remember that there was Canada Dry

16  here and there was Seagram's here.

17        Now, the Canada Dry was all gone.  It was

18  empty.  So I went over to Seagram's, I looked at the

19  front of it.  Okay, it's got ginger root.  Got it.

20        Q.   So, it is now your testimony after meeting

21  with your lawyer for 15 minutes, that you

22  specifically remember when you picked that 12-pack

23  up, you specifically remember at that point in time

24  that you read "made with real ginger"?

25        A.   No.

HIGHLY CONFIDENTIAL

Page 149

1       A.   Oh, because I was tired this morning and I
2  just had a rough morning.  I don't think I was
3  paying close enough attention to her.
4       Q.   Okay.
5       A.   I'm sorry.
6       Q.   Do you recall that you were asked if you
7  paid -- what you paid for -- strike that.
8       Do you recall that you were asked how much you
9  paid for the Seagram's you purchased at Safeway in
10 2014?
11      A.   Yes.
12      Q.   Is it correct that you said you don't
13 think you paid too much or too little?
14      A.   Well, if I knew that it didn't have ginger
15 in it, I paid way too much.  But I didn't know that,
16 so compared to everything else, yes.
17      Q.   Okay.  I am going to try to ask you what
18 you meant by your testimony.
19      You previously said that you paid too much --
20 you didn't pay too much or too little.
21      What did you mean by that?
22      A.   For the product that I thought I was
23 getting, I would have been right in there.  Because
24 all of them were -- a lot of them were that price.
25 It wasn't outrageously priced, that's why I took it.

Page 150

1      And then I read it and it's got real ginger in

2  it, and:  Yay, that's even better.  The front label.

3      Q.   You are saying that you read the front

4  label and then you purchased the product --

5      A.   Absolutely.

6      MR. SAFIER:  -- is that correct?

7      MS. COHEN:  Objection.  Misstates testimony.

8  The lawyer is coaching the witness.

9      BY MR. SAFIER:

10     Q.   And what I want to know is:  By stating

11  you paid too much or too little, what did you mean?

12     A.   I meant it was right in there with the

13  rest of them.  If it -- if I had known that it did

14  not have anything in it, but I didn't know that.  I

15  didn't know.

16     BY MR. SAFIER:

17     Q.   So, when you say:  "Right in there with

18  the rest of them," do you mean that the price was

19  right in there with the rest of them?

20     A.   Yeah.

21     Q.   Right.  And now that you know that the

22  Seagram's product did not contain real ginger root,

23  going back in time would you have purchased that

24  product?

25     A.   No.

HIGHLY CONFIDENTIAL

1      Q.   I get it.  Let me see if I can clarify

2   this.

3      A.   Okay.  Say it again.

4      Q.   When you were recalling about starting to

5   read labels in 2014, did you start to read labels --

6   when you refer to that, are you talking about the

7   back of the label that you referred to in 2014?

8      MS. COHEN:  Objection to form.

9      THE WITNESS:  Yes.

10     BY MR. SAFIER:

11     Q.   Okay.  But you later testified that the

12  date was mistake; is that correct?

13     A.   Right.  I never looked at any labels until

14  2016.

15     Q.   And when you say "looked at labels," you

16  mean the back of the labels?

17     A.   I mean the back of the label.  I don't

18  mean like when you see the product in the store.

19  That's the front of the label.

20     Q.   So, you are talking about the ingredients;

21  correct?

22     A.   Yes.

23     Q.   And how do you know that you started

24  looking at the ingredients on the back of the label

25  of ginger ale cans in 2016?  Why was that date

HIGHLY CONFIDENTIAL

Page 153

1  significant?

2        MS. COHEN:  Objection.  Lacks foundation.

3  Misstates evidence.

4        THE WITNESS:  Because that's what I talked to

5  you guys.

6        BY MR. SAFIER:

7        Q.   And why is that important that it would be

8  after when you talked to us?

9        A.   Oh, because now I really read them.  I

10  read the ingredients on almost everything pretty

11  much now.  I have learned you can't go with what

12  they say in the front.

13        Q.   And before you spoke with attorneys from

14  my firm in sometime late in 2016, was it always your

15  practice to read the front of the ginger ale labels

16  before you purchased them?

17        A.   Yeah.

18        Q.   That includes Seagram's Ginger Ale?

19        A.   Yes.

20        Q.   And Canada Dry Ginger Ale?

21        A.   Yes.

22        MR. SAFIER:  No further questions.

23                  FURTHER EXAMINATION

24        BY MS. COHEN:

25        Q.   Mrs. Russell, on the break that you and