1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

11
12
13

| | |
|---|---|
| JACKIE FITZHENRY-RUSSELL, on behalf of herself, the general public and those similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>The COCA-COLA COMPANY.,<br><br>        Defendant. | Case No. 5:17-cv-00603-EJD<br><br>[~~PROPOSED~~] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT<br><br>DATE:      October 3, 2019<br>TIME:      9:00 am<br>CTRM:    4, 5th Floor<br>JUDGE:   Hon. Edward J. Davila |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   Plaintiffs Jackie Fitzhenry-Russell, David Swartz, Ashley Salcedo, Scott Miller, Isabelo
2   Pascual, Florin Carlin, and Kristina Hoffman ("Class Representatives") have moved the Court for
3   final approval of a proposed class action settlement with Defendant The Coca-Cola Company
4   ("Defendant"), the terms and conditions of which are set forth in the Settlement Agreement filed
5   with the Court on May 9, 2019 ("Settlement Agreement") (Dkt. 84-3, Ex. 1).[1] For the reasons
6   described more fully below, the Court GRANTS final approval of the Settlement.

7   **PROCEDURAL HISTORY**

8   This case concerns the marketing and labeling of Seagram's ginger ale ("Products") from
9   April 1, 2013 to June 13, 2019 ("Class Period").  The procedural history is summarized in the
10   Order Granting Preliminary Approval (Dkt. 89.)

11   **SUMMARY OF SETTLEMENT TERMS**

12   Under the Settlement Agreement, Defendant is stipulating to a nationwide injunction that
13   requires it to remove the phrase "Made with Real Ginger" from all Labeling of any Seagram's
14   Ginger Ale (collectively, the "Products").   Defendant may, however, continue to use any of the
15   following words and phrases on the Products' labeling: "ginger," "real ginger," or "natural
16   ginger," in combination with one of the following three words: "taste," "extract," or "flavor," all
17   as more fully described herein.

18   The Settlement Class comprises: All persons who between April 1, 2013 and June 13,
19   2019 purchased in the United States any Seagram's Ginger Ale Products except for purposes of
20   resale.  The Settlement creates a fund of $2,450,000 against which Settlement Class Members
21   may file a claim to receive a refund for each Unit of the Products purchased between April 1,
22   2013 and June 13, 2019. Those who filed a timely claim will receive a cash payment of $0.80 for
23   each Product purchased during the class period, with a guaranteed minimum payment of $4.00 for
24   any Household that submits a Valid Claim even without Proof of Purchase.  There is a $10.40 (13
25   Unit) per-Household cap on recovery for claims without Proof of Purchase and an $80.00 (100
26   Unit) per-Household cap on recovery for all claimed purchases, provided the Household provides

27
28   [1] Capitalized terms herein have the same meaning as set forth in the Settlement Agreement.

1

1   valid Proof of Purchase for at least 87 of those purchases.

2         Finally, the Settlement provides that Plaintiffs may seek an award of up to $735,000 in

3   attorneys' fees, $85,000 in costs, and up to $11,000 in total incentive awards for Class

4   Representatives.

5                       **NOTICE AND SETTLEMENT ADMINISTRATION**

6         The Settlement Agreement is being administered by a well-known, independent claims

7   administrator, RG/2 Claims Administration ("RG/2"). Following the Court's preliminary

8   approval and conditional certification of the nationwide settlement, RG/2 established a settlement

9   website (the "Settlement Website") at http:// www.gingeralesettlement.com—which contained the

10  settlement notices, the procedures for class members to submit claims or exclude themselves, a

11  contact information page that includes address and telephone numbers for the claim administrator

12  and the parties, the Settlement Agreement, the signed order of preliminary approval, online and

13  printable versions of the claim form and the opt out forms, answers to frequently asked questions,

14  and a Product list. In addition, the papers in support of final approval and the application for

15  attorneys' fees, costs, and incentive awards were placed on the website after they were filed.  The

16  claim administrator also operated a toll-free number for class member inquiries.

17        Notice was published in multiple media outlets, all of which referred class members to the

18  settlement website, delivering approximately 300,000 unique visitors to that website. Online

19  Notice comprised of more than 26 million advertisement impressions that were displayed on a

20  variety of websites (both mobile and desktop) targeted at likely members of the Class based on

21  demographic data, including to persons believed to have purchased Seagram's products, likely

22  purchasers of ginger ale in general, and adults 18-44, who are a primary demographic among

23  Settlement Class Members. Baldwin Decl. ¶ 7 & Ex. C. These ads were displayed on Facebook,

24  Instagram, and multiple other websites known to reach those demographic groups. The published

25  notices pointed to, and all the online notices hyperlinked to, the Settlement Website. In addition,

26  the Short Form Notice was published in the July 29, 2019 issue of *People* magazine and released

27  on PR Newswire on July 22, 2019. *Id.* ¶¶ 8-9

28        Moreover, Class Counsel and the claim administrator undertook several actions above and

beyond the notice plan to provide notice and encourage claims. For example, GSLLP attorneys reviewed, tested, and requested changes to several initial versions of the Settlement Website, including improving the clarity and operation of the claim form and debugging certain aspects of the claim processing; corresponded with the claims administrator to discuss improvements to the notice program and the claim process, to increase the claim rate; and responded to numerous inquiries from class members about the settlement and filing claims. Gutride Reply Decl. ¶ 2. At GSLLP's request, the claims administrator also took steps to stimulate claims. In particular, the claims administrator utilized Facebook Retargeting to show additional advertisements to individuals who either visited the Settlement Website landing page and did not file a claim or started a claim form and did not submit it. The claims administrator also requested that the website TopClassActions.com give the Settlement "Primary Newsletter Focus," which featured the settlement in the website's bi-weekly newsletter sent to over 770,000 subscribers. *Id.* ¶ 3.

Class members were given until September 5, 2019 to object to or exclude themselves from the Proposed Settlement. A total of 128,887 claims were received by the administrator, with an estimated dollar value to be paid to claimants of $1.3 million out of the $2.45 million common fund. That far exceeds the 75,000 to 100,000 anticipated claims upon which the Court granted preliminary approval.

## ANALYSIS

### I.   JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1332(d)(2).

### II.   OBJECTIONS

There was only one objection to the settlement.  It was filed by Charles M. Thompson after the deadline to submit objections had passed. His only basis for objecting is that the settlement resolves Alabama Deceptive Trade Practices Act claims ("ADTPA") on a class basis despite the fact that the ADTPA prohibits consumers from maintaining class actions. After viewing Plaintiff's response to his objection, Mr. Thompson decided to voluntarily withdraw it.  Plaintiff's counsel stated on the record at the final approval hearing that no consideration was paid for Mr. Thompson's withdrawal. I find the objection properly withdrawn.

3

In any event, the objection is unpersuasive. In *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010) the Supreme Court held that a New York law prohibiting the recovery of certain statutory damages in class actions would not apply in federal court. *Id.* at 410-11; *see also id.* at 432-33 (Stevens, J., concurring). Applying *Shady Grove*, the Eleventh Circuit has held that "[t]he Alabama statute restricting class actions, like the New York statute at issue in *Shady Grove*, does not apply in federal court. Rule 23 controls." *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331, 1336 (11th Cir. 2015).  The same logic applies here.

## III.   CERTIFICATION OF SETTLEMENT CLASS

The Court finds that the prerequisites of Rule 23 of the Federal Rules of Civil Procedure have been satisfied for certification of the Settlement Class for settlement purposes because: Settlement Class Members are so numerous that joinder of all members is impracticable; there are questions of law and fact common to the Settlement Class; the claims and defenses of the Class Representatives are typical of the claims and defenses of the Settlement Class they represent; the Class Representatives have fairly and adequately protected the interests of the Settlement Class with regard to the claims of the Settlement Class they represent; common questions of law and fact predominate over questions affecting only individual Settlement Class Members, rendering the Settlement Class sufficiently cohesive to warrant a class settlement; and the certification of the Settlement Class is superior to individual litigation and/or settlement as a method for the fair and efficient resolution of this matter.  The Court additionally finds, for the reasons set forth in the Plaintiffs' motions for preliminary and final approval, that despite any differences among the laws of the various states, common issues of law and fact predominate, making certification of a nationwide class appropriate.  In particular, the challenged labeling claim did not vary from state to state; the various states require similar elements of proof with respect to the asserted claims in the Second Amended Complaint; and common issues under those laws predominate. *See Espinosa v. Ahearn (In re Hyundai & Kia Fuel Econ. Litig.)*, 926 F.3d 539, 560 (9th Cir. 2019) (en banc) (affirming nationwide settlement class in case involving a "nationwide, concerted marketing effort"). To the extent there are differences among state laws, plaintiffs have demonstrated that similarly situated states can be combined into subclasses and there exist named

plaintiffs in the Second Amended Complaint who can represent each such subclass. *See id.* at 563 (holding that variations in state law did not defeat predominance in nationwide settlement class because such variations are an issue "for trial manageability" and that "[in] settlement cases, such as the one at hand, the district court need not consider trial manageability issues").

For purposes of the settlement and this Final Approval Order and Judgment, the Court hereby finally certifies the following Settlement Class: All persons who between April 1, 2013 and June 13, 2019, purchased, in the United States, any Seagram's Ginger Ale Products. "Excluded Persons" from the Settlement Classes are: (1) the Honorable Edward J. Davila, the Honorable Virginia K DeMarchi; the Honorable Howard R. Lloyd; the Honorable Wayne Andersen (Ret.); (2) any member of their immediate families; (3) any government entity; (4) Defendant; (5) any entity in which Defendant has a controlling interest; (6) any of Defendant's subsidiaries, parents, affiliates, and officers, directors, employees, legal representatives, heirs, successors, or assigns; (7) counsel for the Parties; and (8) any persons who timely opted out of the Settlement Class.

For the purpose of this settlement, the Court hereby finally certifies Plaintiffs Jackie Fitzhenry-Russell, David Swartz, Ashley Salcedo, Scott Miller, Isabelo Pascual, Florin Carlin, and Kristina Hoffman as Class Representatives and designates the law firm of Gutride Safier LLP as Settlement Class Counsel.

## IV. NOTICE AND CLAIMS ADMINISTRATION

The Notice Plan provides notice to class members by publication, rather than directly, but this is appropriate here where the evidence is undisputed that the parties do not know the names or contact information for class members, as the purchases were made at retail and Defendant is a wholesaler. Under these circumstances, individualized notice was not required or reasonably practicable. *See, e.g., Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1129 (9th Cir. 2017) (recognizing that Rule 23 "does not insist on actual notice to all class members;" and "courts have routinely held that notice by publication in a periodical, on a website, or even at an appropriate physical location is sufficient to satisfy due process"); *In re Toys R Us-Delaware, Inc. FACTA Litigation*, 295 F.R.D. 438, 449 (C.D. Cal. 2014) ("When the court certifies a nationwide class of

persons whose addresses are unknown, notice by publication is reasonable."). The Court reaffirms

the finding it made in the order granting preliminary approval that the published notice plan

provided the best practicable notice to the members of the class and satisfied the requirements of

due process. *See, e.g., Fitzhenry-Russell v. Keurig Dr. Pepper, Inc.*, No. 5:17-cv-00564-NV, Dkt.

No. 350, pp. 5, 8-9 (N.D. Cal. April 10, 2019) ("Canada Dry Final Approval Order") (approving

virtually identical notice plan regarding ginger ale beverage); *Miller v. Ghirardelli Chocolate Co.*,

No. 12-CV-04936-LB, 2015 WL 758094, at *3 (N.D. Cal. Feb. 20, 2015) (approving similar

publication notice plan in class action regarding grocery store item); *Arnold v. Fitflop USA, LLC*,

No. 11-CV-0973 W KSC, 2014 WL 1670133, at *5 (S.D. Cal. Apr. 28, 2014) (same for class

action regarding shoes); *see also Ellison v. Steven Madden, Ltd.*, No. CV115935PSGAGRX,

2013 WL 12124432, at *3 (C.D. Cal. May 7, 2013) (approving a notice plan reaching 77%); *In

re: Whirlpool Corp. Front–loading Washer Prod. Liab. Litig.*, No. 1:08-WP-65000, 2016 WL

5338012, at *9 (N.D. Ohio Sept. 23, 2016) (approving notice plan reaching approximately 77.5

percent of Class Members).

## V.    FINAL APPROVAL OF SETTLEMENT AGREEMENT

A court may approve a proposed class action settlement of a certified class only "after a

hearing and on finding that it is fair, reasonable, and adequate after considering whether: (A) the

class representatives and class counsel have adequately represented the class; (B) the proposal

was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into

account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed

method of distributing relief to the class, including the method of processing class-member

claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class

members equitably relative to each other." Fed. R. Civ. P. 23(e)(2).[2] In reviewing the proposed

---

[2] Prior to the amendments to Rule 23, which took effect December 1, 2018, the Ninth Circuit had
enumerated a similar list of factors to consider in evaluating a proposed class settlement.  *See
Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (enumerating the
following factors: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and
likely duration of further litigation; (3) the risk of maintaining class action status throughout the
trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of

1   settlement, the Court need not address whether the settlement is ideal or the best outcome, but

2   determines only whether the settlement is fair, free of collusion, and consistent with plaintiff's

3   fiduciary obligations to the class. *See Hanlon v. Chrysler Corp.*, 150 F.3d at 1027.

4        For the reasons further detailed below and discussed at oral argument, the Court finds that

5   the proposed settlement is fair and appropriate under the Rule 23(e)(2) factors. The main issue in

6   this case is whether the "Made with Real Ginger" claim was false, or likely to mislead consumers

7   about the form of the ginger in the beverage or its health benfits. There would be a battle of the

8   experts regarding consumer understanding and materiality of the representation and the

9   computation of damages, if any.  For example, Plaintiffs' expert opined that damages were

10  approximately 6% of the purchase price of the Products, and Defendant's expert opined damages

11  were zero.  Proceeding to trial would have been costly; recovery was not guaranteed; and there

12  was the possibility of protracted appeals. Even if Plaintiffs succeded, the best-case recovery per

13  Unit after trial was less than the amount offered in settlement, and a claims process would be

14  required even after trial, because class members could not otherwise be identified. The settlement

15  occurred only after extensive litigation including a contested motion to dismiss, contested

16  discovery motions, numerous fact and expert depositions, review of thousands of pages of

17  documents, interrogatories, requests for admission, and third-party discovery. Counsel for both

18  parties were highly experienced; Plaintiffs' counsel provided detailed declarations explaining

19  why they supported the settlement, and there is no factual basis to support any allegation of

20  collusion or self-dealing.

21         **A.      Class Representatives and Class Counsel Have Adequately
                      Represented the Class.**

22

23      In the order preliminarily approving the Settlement, the Court found that the Class

24  

25  the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental
    participant; and (8) the reaction of the class members to the proposed settlement"). In the notes
26  accompanying the Rule 23 amendments, the Advisory Committee explained that the amendments
    were not designed "to displace any factor, but rather to focus the court and the lawyers on the
27  core concerns of procedure and substance that should guide the decision whether to approve the
    proposal." Accordingly, this Court applies the framework of Rule 23 while "continuing to draw
28  guidance from the Ninth Circuit's factors and relevant precedent." *Hefler v. Wells Fargo & Co.*,
    No. 16-cv-05479-JST, 2018 U.S. Dist. LEXIS 213045 *13 (N.D. Cal. Dec. 17, 2018).

1  Representatives and Class Counsel adequately represented the interested of the Class.  There is no

2  evidence contradicting the previous finding. Class Counsel has vigorously prosecuted this action

3  through dispositive motion practice, extensive discovery, and formal mediation.  Class Counsel

4  also prosecuted a similar class action relating to the "Made from Real Ginger" on Canada Dry

5  Ginger Ale, which settled on the eve of trial. Counsel therefore "possessed sufficient information

6  to make an informed decision about settlement." *Hefler*, 2018 U.S. Dist. LEXIS 213045 *18.

**B.      The Settlement Was Negotiated at Arm's Length.**

8  This Court finds that the settlement is the product of serious, non-collusive, arms' length

9  negotiations by experienced counsel with the assistance of a well-respected and experienced

10  mediator, former U.S. District Judge Wayne Andersen, of JAMS. *See, e.g, G. F. v. Contra Costa

11  Cty.*, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) (noting that "[t]he assistance of an

12  experienced mediator in the settlement process confirms that the settlement is non-collusive");

13  *Hefler*, 2018 U.S. Dist. LEXIS 213045 *19 ("[T]he Settlement was the product of arm's length

14  negotiations through two full-day mediation sessions and multiple follow-up calls supervised by

15  former U.S. District Judge Layn Phillips.").  Further, before agreeing upon the terms of the

16  settlement, the parties engaged in extensive factual investigation, which included seven fact and

17  expert depositions, document production of thousands of pages, interrogatories, and third-party

18  discovery. The parties also briefed various important legal issues in connection with the motion to

19  dismiss. In addition, Plaintiff Ms. Fitzhenry-Russell and her counsel have experience in other

20  ginger ale litigation, which settled days before trial was scheduled to begin, that has further

21  informed their views about the claims in this case. The record was thus sufficiently developed

22  that the parties were fully informed as to the viability of the claims and able to adequately

23  evaluate the strengths and weaknesses of their respective positions and risks to both sides if the

24  case did not settle.

25  Further, the Court notes that this settlement follows a similar settlement involving the

26  "Made from Real Ginger" claim on Canada Dry Ginger Ale, which was approved by Judge

27  Nathanael Cousins of this District and was the product of negotiations and mediation session with

28  former United States District Judge Wayne Andersen. Canada Dry Final Approval Order at 9.

1    The Court has independently and carefully reviewed the record for any signs of collusion

2    and self-dealing, and finds that no collusion or self-dealing occurred.  Specifically, the Court

3    finds that Class counsel did not compromise the claims of the settlement class in exchange for

4    higher fees.

5    ### C.    The Relief to the Class is Adequate

6    #### 1.    Recovery to the Class

7    Although not articulated as a separate factor in Rule 23(e), "[t]he relief that the settlement

8    is expected to provide to class members is a central concern." Fed. R. Civ. P. 23(e)(2)(C)-(D)

9    advisory committee's note to 2018 amendment. "The Court therefore examines 'the amount

10   offered in settlement.'" *Hefler*, 2018 U.S. Dist. LEXIS 213045 *18 (quoting *Hanlon*, 150 F.3d at

11   1026).

12   #### a)    Injunctive Relief

13   "Injunctions are the primary form of relief available under the UCL to protect consumers

14   from unfair business practices, while restitution is a form of ancillary relief." *Kwikset v. Superior*

15   *Court*, 51 Cal. 4th 310, 337 (2011). The Settlement requires Defendant to remove the phrase

16   "Made with Real Ginger" from the marketing and labeling of Seagram's Ginger Ale.  Consistent

17   with the evidence discovered in the case, the parties bargained for and reached agreement that the

18   Defendant may, at its option, use any of the following words and phrases: "ginger," "real ginger,"

19   or "natural ginger," in combination with one of the following three words: "taste," "extract," or

20   "flavor."   All of this is consistent with the evidence that Defendant's supplier, Givaudan Flavors

21   Corporation, utilized ginger root to make the flavor extract used in Seagram's Ginger Ale.  Thus,

22   under the terms of the injunction, as an example, future packaging, may, but need not, state "real

23   ginger taste," "made with real ginger extract," "real ginger flavor," "flavor from real ginger

24   extract," or "natural ginger flavor."  The Permanent Injunction also allows Defendant to use the

25   phrases "ginger extract," "natural ginger flavor extract," "natural ginger extract," "natural ginger

26   flavor," or "ginger flavor" in the label ingredient line.  The Parties agree that such approved

27   examples shall not limit other usages and combinations of the Approved Permitted Label Claim

28   in conjunction with other words or phrases.   All of this is consistent with the Court's

11412488v.1

1  understanding of the discovery and evidence in the case. *See* Canada Dry Final Approval Order at

2  8 (finding that a virtually identical injunction on the labeling of Canada Dry ginger ale provided

3  "significant" relief to the class).

4       It is appropriate for the Court to consider the injunctive relief in assessing the benefit to

5  the class. *See Allen*, 787 F.3d at 1225 (citing *Bluetooth*) ("As a whole, the settlement appears to

6  afford valuable relief, much by injunction, that will benefit the class;" remanding to allow district

7  court opportunity to make express findings about value of that relief). This is true even if some of

8  the value goes to the general public. *See, e.g.*, *In re TracFone Unlimited Service Plan Litigation*,

9  112 F. Supp. 3d 993, 1005 (N.D. Cal. 2015) ("The Court finds that the injunctive relief will have

10  significant value for both class members and the general public.").

11             **b)**       **Monetary Recovery**

12       Defendant also agreed to create a settlement fund of $2,450,000 against which Settlement

13  Class Members may make a claim for restitution of $0.80 per Unit, with a minimum of $4.00 per

14  Household, and up to $10.40 (thirteen Units) per Household without proof of purchase and

15  $80.00 (100 Units) with proof of purchase.  If funds remain after payment of all valid claims (and

16  the attorneys' fees and costs, discussed *supra*), the residual shall be paid *cy pres* to two charitable

17  organizations as described below.

18       Plaintiff's evidence showed that its likely "best case" recovery at trial would be an

19  average of six percent of each Unit's retail price, which Plaintiff's counsel calculated would

20  represent approximately $0.14 per unit on averate. The six percent "price premium" was based on

21  a conjoint model proffered by Plaintiffs' experts during the period for expert discovery in

22  connection with class certification. The conjoint model uses a survey that shows respondents

23  hypothetical products at differing prices, some with and without the claim (among other varying

24  product attributes), and the results are input into a market simulator that determines the value

25  consumers place on the "Made with Real Ginger" claim.  Defendant challenges the methodology

26  and its experts testified that because sodas are "line-priced," there could be no premium, so

27  damages were $0.00.  Thus, the recovery here of $0.80 per Unit exceeds the 6 percent price

28  premium set forth by Plaintiffs' experts.  Even after a successful verdict, it would be necessary to

use a claim process to direct the recovery to the actual class members, as Defendant did not possess records that identified the retail purchasers.

Based on the record evidence and argument submitted by the parties in connection with the settlement, as well as the familiarity the Court has developed over the past two years with the claims and defenses in this case, the Court finds that this monetary recovery is fair, reasonable and adequate, particularly given the overall claimed actual damages amount, risks of proceeding to trial, and the amount made available to claimants. *Accord* Canada Dry Final Approval Order at 8 (finding that $0.40 per Unit was reasonable and adequate monetary relief to the class).

### 2.    The Strength of Plaintiffs' Case and Risk of Continuing Litigation

Although Plaintiffs' California claims survived a motion to dismiss, the claims from other states had not yet faced such a motion, nor had a class been certified. Plaintiffs faced serious risk at a trial. Each required expert analysis to establish that the "Made with Real Ginger" claim was misleading, material to consumer purchasing decisions, and caused a price premium paid by consumers. As detailed in Plaintiffs' motion, each of these expert methodologies was subject to criticism of cross-examination and could have been discounted by the jury. Further, evidence from the Defendant's own experts regarding the real-world pricing of Seagram's Ginger Ale products, including retail-line pricing, cast doubt on Plaintiffs' market-simulation method of establishing class-wide damages.

### 3.    Effectiveness of Distribution Method.

As noted above, the Court concludes that the distribution method and claims process is reasonable. Class Members who seek benefits under the Settlement must only submit a relatively simple claim form with basic questions about class membership. The process would be no different than that required after trial, as Defendant is a wholesaler and has no means of directly identifying retail-purchasing class members.

### 4.    The Terms of the Proposed Award of Attorneys' Fees

As noted in section VII below, the Court finds the proposed award of attorneys' fees reasonable.

11

### 5.   Other Agreements.

The Court is required to consider "any agreements required to be identified under Rule 23(e)(3)." The parties have not identified any such agreements.

### D.   The Proposal Treats Class Members Equitably Relative to Each Other

All class members are entitled to the same relief under the Settlement. This proposal is fair and equitable because the $0.80 per product refund is far greater than the $0.14 average alleged price premium that Plaintiffs' counsel anticipated recovering in the best-case scenario. Plaintiffs' damages theory is that every class member overpaid by 6% or 6.33%. Even though products may have been sold at different prices based on size or retail location, the uniform relief makes it unnecessary for claimants to testify how much they paid for each purchase and makes the settlement administratively efficient. The incentive awards for the named plaintiffs are appropriate for the reasons stated below.

### E.   The Response of Class Members.

Out of an estimated four million class members, there were 5 opt-outs and no objections.[3] In comparison, there were 128,887 claims, according to the report of the Settlement Administrator. This is an overwhelmingly positive response. *See Churchill Village, LLC v. General Electric,* 361 F.3d 566, 577 (9th Cir. 2004) (explaining that a court may infer appropriately that a class action settlement is fair, adequate, and reasonable when few class members object to it); Canada Dry Final Approval Order at 8-9 (finding "the reaction of class members to the proposed Settlement is overall positive" where 91,254 claims were filed and there were 318 opt outs and two objections); *Zepeda v. PayPal, Inc.*, 2017 WL 1113293, at *16 (N.D. Cal. Mar. 24, 2017) (holding "the indisputably low number of objections and opt-outs, standing alone, presents a sufficient basis upon which a court may conclude that the reaction to settlement by the class has been favorable); *Cruz v. Sky Chefs, Inc.*, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) ("A court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it."); *see also, e.g., In re Carrier IQ, Inc.,*

---

[3] As noted below, there was one purported objector who withdrew his objection prior to the final approval hearing.

[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND JUDGMENT

11412488v.1

*Consumer Privacy Litig.*, 2016 WL 4474366, at *4 (N.D. Cal. Aug. 25, 2016) (stating that, "[i]n an analysis of settlements where notice relied on media notice exclusively, the claims rate ranged between 0.002% and 9.378%, with a median rate of 0.023%").

## VI.   COSTS OF ADMISTERING THE SETTLEMENT

The Claim Administrator has submitted an invoice for its expenses incurred to date and expected to be incurred through the completion of its work, in the amount of $230,329. Included in this invoice is the amount for all taxes due from the Settlement Fund. The Court finds that such amounts are reasonable and authorizes payment of the invoices, in full, from the Settlement Fund.

## VII.   ATTORNEY'S FEES

Class counsel requests a fee award of $735,000 in attorneys' fees and costs. Defendant does not oppose the fee request. The record is undisputed that the settlement negotiation was overseen by an experienced mediator and that as fees were coming only from the settlement fund, Plaintiffs' counsel had an incentive to maximize the class recovery in order to maximize their fees as a percentage of recovery. *See, e.g., In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 2017 WL 1047834, at *4 (N.D. Cal., Mar. 17, 2017 ("Volkswagen's agreement not to oppose the application does not evidence collusion and was not obtained by Class Counsel to Class Members' detriment."); *G. F. v. Contra Costa Cty.*, 2015 WL 4606078, at *13 (N.D. Cal. July 30, 2015) (noting that "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive").

Where a settlement involves a common fund, courts typically award attorneys' fees based on a percentage of the total settlement. *See State of Fla. v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *see also In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (affirming attorney's fee award of 33% of the recovery); *Morris v. Lifescan, Inc.*, 54 F. App'x 663, 664 (9th Cir. 2003) (affirming attorney's fee award of 33% of the recovery). When determining the value of the settlement, courts consider both the monetary and non-monetary benefits conferred under the settlement terms.  *See, e.g., Staton v. Boeing Co.,* 327 F.3d 938, 972-74 (9th Cir. 2003); *Hartless v. Clorox Co.,* 273 F.R.D. 630, 645 (S.D. Cal. 2011), *aff'd,* 473 F. App'x. 716 (9th Cir. 2012). The Court also considers the value of injunctive relief when assessing fees, but need not

13

1    determine a specific monetary value associated with that relief.  *See Laguna v. Coverall N. Am.,*

2    *Inc.*, 753 F.3d 918, 924 (9th Cir. 2014) *vacated on other grounds*, 772 F.3d 608 (9th Cir. 2014)

3    ("[W]e have never required a district court to assign a monetary value to purely injunctive relief.

4    To the contrary, we have stated that courts cannot 'judge with confidence the value of the terms

5    of a settlement agreement, especially one in which, as here, the settlement provides for injunctive

6    relief.'"); *Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) (a district court still "should

7    consider the value of the injunctive relief as a 'relevant circumstance'" in its fee determination).

8    Additionally, Ninth Circuit precedent requires courts to award class counsel fees based on the

9    total benefits being made available to class members rather than the amount actually claimed.

10   *Young v. Polo Retail, LLC*, 2007 U.S. Dist. LEXIS 27269, at *23 (N.D. Cal. Mar. 28, 2007)

11   (citing *Williams v. MGM-Pathe Commc'ns Co.*, 129 F.3d 1026 (9th Cir. 1997) (finding "district

12   court abused its discretion in basing attorney fee award on actual distribution to class" instead of

13   amount being made available)).

14        In the Ninth Circuit, the benchmark for an attorney fee is 25% of the total settlement

15   value, including the monetary and non-monetary recovery.  *See Six Mexican Workers*, 904 F.2d at

16   1311; *see also Staton*, 327 F.3d at 974 ("[W]here the value to individual class members of

17   benefits deriving from injunctive relief can be accurately ascertained . . . courts [may] include

18   such relief as part of the value of a common fund for purposes of applying the percentage method

19   . . . ."). The benchmark percentage "can then be adjusted upward or downward to account for any

20   unusual circumstances involved in the case."  *Paul, Johnson, Alston & Hunt v. Graulty, 88*6 F.2d

21   268, 272 (9th Cir. 1989).  Many cases have found that between 30% and 50% of the common

22   fund is an appropriate range when the settlement fund is less than ten million.  *See Van Vranken*

23   *v. Atl. Richfield Co.*, 901 F. Supp. 294, 297-98 (N.D. Cal. 1995) (collecting cases); *see also*

24   *Johnson v. Gen. Mills, Inc.*, 2013 WL 3213832, at *6 (C.D. Cal. June 17, 2013) (awarding a fee

25   award of 30% of the settlement fund in a food labeling class action). Here Plaintiffs' fee request

26   amounts to 30% of the monetary value of the settlement. Although that is slightly greater than the

27   benchmark of 25%, the award is nonetheless reasonable. The total monetary relief is under $10

28   million, but the primary form of relief under the UCL is an injunction, not restitution. Defendant

14

1  here is agreeing to a permanent injunction to change its label. That is a significant portion of the

2  total relief in the settlement but is difficult to value monetarily.

3       A cross-check on Class Counsel's lodestar also supports the fee award. The Court is not

4  obligated to consider Class Counsel's lodestar in evaluating the percentage of the fund to be

5  awarded via a cross-check. *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737 (9th Cir.

6  2017) (noting that district court did but was not required to do a lodestar method cross-check);

7  *Yamada v. Nobel Biocare Holding AG*, 825 F.3d 536, 547 (9th Cir. 2016) ("[A] cross-check is

8  entirely discretionary . . . ."); *Bolton v. U.S. Nursing Corp.*, No. C 12-4466 LB, 2013 WL

9  5700403, at *5 (N.D. Cal. Oct. 18, 2013) ("In a common fund case, a lodestar method does not

10  necessarily achieve the stated purposes of proportionality, predictability and protection of the

11  class and can encouraged unjustified work and protracting the litigation."). Nevertheless, I retain

12  discretion to perform a cross-check and determine Class Counsel's fee here is eminently

13  reasonable.

14       Under the lodestar approach, "[t]he lodestar (or touchstone) is produced by multiplying

15  the number of hours reasonably expended by counsel by a reasonable hourly rate." *Lealao v.*

16  *Beneficial California, Inc.*, 82 Cal. App. 4th 19, 26 (2000). Once the court has fixed the lodestar,

17  it may increase or decrease that amount by applying a positive or negative "multiplier to take into

18  account a variety of other factors, including the quality of the representation, the novelty and

19  complexity of the issues, the results obtained and the contingent risk presented." *Id.*; *see also*

20  *Serrano III*, 20 Cal. 3d at 48-49; *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal. App.

21  4th 615, 622; *Beasley v. Wells Fargo Bank,* 235 Cal. App. 3d 1407, 1418 (1991) (multipliers are

22  used to compensate counsel for the risk of loss, and to encourage counsel to undertake actions

23  that benefit the public interest).

24       Plaintiffs' Counsel's current lodestar is approximately $796,887.50. (Gutride Reply Decl.

25  ¶ 4). This includes, without limitation, Plaintiffs' Counsel efforts in investigating and filing the

26  complaint; opposing Defendant's motion to dismiss; case management; substantial discovery

27  including document review, depositions, and discovery disputes; expert discovery; negotiating the

28  settlement and preparing the necessary papers to have the settlement reviewed by this Court.

(Gutride Initial Decl. ¶ 48). Of further note, Plaintiffs' lodestar does not include activities by Class Counsel in related ginger ale litigation in this District. That case involved very similar legal claims to those at issue here. It settled only on the eve of trial and Plaintiffs' Counsel's vigorous prosecution of that case, including trial preparations, allowed Counsel to gain expertise and litigate this matter more efficiently. Further, Plaintiffs' Counsel is recovering less than 60% of their lodestar there. Canada Dry Final Approval Order at 5.

Plaintiffs' Counsel calculated their lodestar using Plaintiffs' Counsel's regular billing rates, which for the attorneys involved range from $550 to $1025 per hour. (Gutride Reply Decl. ¶ 4). "Affidavits of the plaintiff['s] attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiff['s] attorney, are satisfactory evidence of the prevailing market rate." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990). For attorneys and staff at the Gutride Safier firm, these hourly rates are equal to market rates in San Francisco for attorneys of Plaintiffs' Counsel's background and experience. (Gutride Initial Decl. ¶¶ 49-52); *see also* Canada Dry Final Approval Order at 10 (approving Gutride Safier's 2018 hourly rates of between $500 to $975 per hour); *Kumar v. Salov N. Am. Corp.*, No. 14-CV-2411-YGR, 2017 U.S. Dist. LEXIS 105463, at *24 (N.D. Cal. July 7, 2017) (finding that Gutride Safier's 2017 hourly rates of up to $950 per hour were "reasonable and commensurate with those charged by attorneys with similar experience in the market"); *Rainbow Bus. Sols. v. MBF Leasing LLC*, No. 10-cv-01993-CW, 2017 U.S. Dist. LEXIS 200188, at *5, 8 (N.D. Cal. Dec. 5, 2017) (finding that Gutride Safier's rates of between "$275 to $950 per hour" for attorneys "are reasonable and commensurate with those charged by attorneys with similar experience who appear in this Court"). No objector has challenged any of counsel's hours or rates.

As further evidence of reasonableness, Class Counsel's requested $735,000 fee results in a negative lodestar multiplier of 0.92 (i.e. an award less than total lodestar of $796,887.50). Courts have found negative multipliers an indication that a percentage of the fund slightly higher than the benchmark 25% is reasonable. *E.g. Covillo v. Specialtys Café,* No. C-11-00594 DMR, 2014 U.S. Dist. LEXIS 29837, at *22-23 (N.D. Cal. Mar. 6, 2014) ("Plaintiffs' requested fee award is

1 approximately 65% of the lodestar, which means that the requested fee award results in a so

2 called negative multiplier, suggesting that the percentage of the fund [33%] is reasonable and

3 fair.") Indeed, courts in this Circuit routinely award positive multipliers between two and five.

4 *See, e.g.*, *Vizcaino*, 290 F.3d at 1051 (finding 3.65 multiplier to be "within the range of

5 multipliers applied in common fund cases"); *Noll v. eBay, Inc.*, 309 F.R.D. 593, 610 (N.D. Cal.

6 2015) (listing multipliers as high as 5.2 among "the range of acceptable lodestar multipliers");

7 *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) ("A 2.83 multiplier falls

8 within the Ninth Circuit's presumptively acceptable range of 1.0–4.0."); *Van Vranken v. Atl.

9 Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) ("Multipliers in the 3–4 range are common

10 in lodestar awards for lengthy and complex class action litigation.").

11      The Court finds that the hours Class Counsel claimed were reasonably worked and that

12 the rates charged are reasonable and commensurate with those charged by attorneys with similar

13 experience who appear in this Court. The Court also finds that Plaintiff's counsel represented

14 their clients with skill and diligence and obtained an excellent result for the class, taking into

15 account the possible outcomes at, and risks of proceeding to, trial. Accordingly, the following

16 amount shall be paid to Class Counsel from the Settlement Fund, as attorneys' fees pursuant to

17 the terms of the Settlement Agreement: $735,000.

18  **VIII.  LITIGATION COSTS**

19      Class counsel also are entitled to reimbursement of reasonable out-of-pocket expenses.

20 Fed. R. Civ. P. 23(h); *see Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (holding that

21 attorneys may recover reasonable expenses that would typically be billed to paying clients in non-

22 contingency matters.); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995)

23 (approving reasonable costs in class action settlement). Costs compensable under Rule 23(h)

24 include "nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P.

25 23(h).

26      Here, class counsel seeks reimbursement of $73,821.15 in litigation expenses including

27 filing fees, deposition expenses, fees for expert witnesses, document review platform data

28 hosting, etc., and provide records to document their claim. No objection has been made to any

1   cost item or amount.  Accordingly, the Court finds that these submissions support an award

2   of $73,821.15 in costs.

3   **IX.   CLASS REPRESENTATIVE SERVICE AWARDS**

4          The district court must evaluate named plaintiffs' awards individually, using relevant

5   factors including "the actions the plaintiff has taken to protect the interests of the class, the degree

6   to which the class has benefitted from those actions, . . . [and] the amount of time and effort the

7   plaintiff expended in pursuing the litigation." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir.

8   2003). "Such awards are discretionary . . . and are intended to compensate class representatives

9   for work done on behalf of the class, to make up for financial or reputational risk undertaken in

10  bringing the action, and, sometimes, to recognize their willingness to act as a private attorney

11  general." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958-959 (9th Cir. 2009). The Ninth

12  Circuit recently emphasized that district courts must "scrutiniz[e] all incentive awards to

13  determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian*

14  *Info. Solutions*, 715 F.3d 1157, 1163 (9th Cir. 2013). Here Plaintiffs are seeking an incentive of

15  $5,000 for Plaintiff Fitzhenry-Russell, and $1,000 for the remaining named Plaintiffs, for a total

16  of $11,000 in incentives.

17         Plaintiff Fitzhenry-Russell took on substantial risk, most importantly the risk of bearing

18  Defendant's costs.  Fitzhenry-Russell also worked with counsel to provide information

19  throughout the litigation, which has now progressed for over two years.  She answered

20  interrogatories and requests for production. She conducted searches of her personal records and

21  sat for a deposition.  The other named Plaintiffs all provided Class Counsel with sufficient

22  information regarding their experiences and claims to enable them to join this case and represent

23  a nationwide class.  And all Plaintiffs remained actively involved in the litigation after the

24  Settlement was reached.

25         For the reasons stated above, the following amounts shall be paid from the Settlement

26  Fund:

27         a.      to Plaintiff Jackie Fitzhenry-Russell: $5,000

28         b.      to Plaintiff David Swartz: $1,000

1        c.       to Plaintiff Ashley Salcedo: $1,000

2        d.       to Plaintiff Scott Miller: $1,000

3        e.       to Plaintiff Isabelo Pascual: $1,000

4        f.       to Plaintiff Florin Carlin: $1,000

5        g.       to Plaintiff Kristina Hoffman: $1,000

6    **X.    CY PRES**

7            If after payment of the amounts set forth in sections VI-VIII, above, as well as the payment

8    of Valid Claims (including any pro-rata increase of such payment) as set forth in Part III of the

9    Settlement Agreement, money remains in the Settlement Fund, that remainder shall be paid,

10   pursuant to the cy pres doctrine, in equal shares to National Consumers League, Washington, DC

11   and the Better Business Bureau's Institute for Marketplace Trust. The cy pres doctrine is

12   appropriate for a case like this one, where class members who did not make claims cannot be

13   easily located or identified, in order to "put the unclaimed fund to its next best compensation use,

14   *e.g.,* for the aggregate, indirect, prospective benefit of the class." *Nachshin v. AOL, LLC*, 663 F.3d

15   1034, 1038 (9th Cir. 2011) (citing *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436

16   (2d Cir.2007))*.* A cy pres remedy must "bear[] a substantial nexus to the interests of class

17   members." *Lane v. Facebook*, 696 F.3d 811, 821 (9th Cir. 2012) *cert. denied,* 134 S. Ct. 8 (U.S.

18   2013). In evaluating a cy pres component of a class action settlement, courts look to factors set

19   forth in *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir.

20   1990). Specifically, the cy pres remedy "must account for the nature of the plaintiffs' lawsuit, the

21   objectives of the underlying statutes, and the interests of the silent class members...." 663 F.3d at

22   1036 (citing *Six Mexican Workers,* 904 F.2d at 1307).  The Court finds the cy pres recipients

23   appropriate for the following reasons.

24           National Consumers League ("NCL") is the "nation's oldest" consumer advocacy

25   organization, representing consumers on marketplace issues such as food health and labeling.

26   According to its website "NCL is working hard to help consumers make smart decision to nourish

27   their families" and to encourage "honest labeling." https://www.nclnet.org/food_policy?page=3.

28   NCL also performs legal work on food labeling cases, including petitioning agencies to take

[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND JUDGMENT

action against product mislabeling, and filing suit on behalf of aggrieved consumers. The Better Business Bureau's Institute for Marketplace Trust is a non-profit organization that states that it "teach[es] consumers how to take control of their purchasing decisions and avoid falling prey to scams." https://www.bbbmarketplacetrust.org/. It also works with business to promote business ethics, better business behaviors and leadership. Both of these organizations will indirectly benefit class members who did not file a claim and are in line with the objectives of the consumer protection statutes underlying plaintiff's claims. Cy Pres is also appropriate because increasing claimants' recovery pro-rata would result in their being greatly overcompensated.

## XI.   COMPLIANCE WITH CLASS ACTION FAIRNESS ACT

The record establishes that counsel served the required notices under the Class Action Fairness Act of 2005, 28 U.S.C. § 1715, with the documentation required by 28 U.S.C. § 1715(b)(1-8).

## XII.   INJUNCTION

Pursuant to the terms of the Settlement Agreement, Defendant shall be required to begin production of new Seagram's Ginger Ale labeling, which does not contain the phrase "Made With Real Ginger," within 120 days of the Effective Date as defined in Section 2.13 of the Settlement Agreement.  Defendant shall be required to complete the transition to new labeling, such that all product labeling designs transmitted to Defendant's vendors for use on product packaging reflect the removal of the phrase "Made With Real Ginger," within 365 days of the Effective Date (or any further extension of the United States Food and Drug Administration's deadline for new nutrition fact panel changes).   .

This injunction does not require Defendant or its bottlers, distributors, wholesalers, or retailers to withdraw, destroy, or refrain from selling through any old stock of Product units whose labeling contains the "Made with Real Ginger" claim, during or after Defendant's transition to new labeling; and neither Defendant nor any bottler, distributor, wholesaler, or retailer shall be held liable for the sale of such old stock more than 365 days after the Effective Date.  This injunction hereby expressly permits Defendant, at its option, to use any of the following words and phrases: "ginger," "real ginger," or "natural ginger," in combination with

one of the following three words: "taste," "extract," or "flavor." For example, the words "taste," "extract," or "flavor" may be used, preceding, or following, the words "ginger," "real ginger," or "natural ginger" (the "Approved Permitted Label Claim"). By way of example, the injunction shall include these Approved Permitted Label Claim examples of permissible label claims: "real ginger taste," "made with real ginger extract," "real ginger flavor," "flavor from real ginger extract," and "natural ginger flavor." The injunction hereby expressly permits use of "ginger extract," "natural ginger flavor extract," "natural ginger extract," "natural ginger flavor," or "ginger flavor" in the label ingredient line. Such approved examples shall not limit other usages and combinations of the Approved Permitted Label Claim in conjunction with other words or phrases.

Finally, neither the Settlement Agreement nor the injunction issued pursuant hereto shall be interpreted to impose any limitations on the future marketing or sale of the Products except as expressly set forth in this section. Similarly, neither the Settlement Agreement nor the injunction issued pursuant hereto shall be interpreted to impose any limitations on the composition, manufacture, marketing, labeling, advertising, and/or sale of any product or products other than those falling within the definition of "Products" set forth in Section 2.34 of the Settlement Agreement. Nothing in this paragraph shall be interpreted to interfere with Defendant's obligations to comply with all applicable state and federal laws.

## XIII.  RELEASES; EFFECT OF THIS ORDER

### A.        Releases by Class Representatives

Plaintiffs on the one hand, and Defendant and its past and present agents, employees, representatives, officers, directors, shareholders, members, attorneys, accountants, insurers, receivers, advisors, consultants, partners, partnerships, parents, divisions, subsidiaries, affiliates, assigns, agents, independent contractors, successors, heirs, predecessors in interest, joint ventures, and commonly-controlled corporations on the other hand (collectively, the "Released Parties"), shall have unconditionally, completely, and irrevocably released and forever discharged each other from and shall be forever barred from instituting, maintaining, or prosecuting (1) any and all claims, liens, demands, actions, causes of action, rights, duties, obligations, damages or liabilities

21

of any nature whatsoever, whether legal or equitable or otherwise, known or unknown, that actually were, or could have been, asserted in the Litigation, whether based upon any violation of any state or federal statute or common law or regulation or otherwise, or arise directly or indirectly out of, or in any way relate to, the allegations, claims, or contentions that Plaintiffs, on the one hand, and Defendant, on the other hand, have had in the past, or now have, related in any manner to the Defendant's products, services or business affairs; and (2) any and all other claims, liens, demands, actions, causes of action, rights, duties, obligations, damages or liabilities of any nature whatsoever, whether legal or equitable or otherwise, known or unknown, that Plaintiffs, on the one hand, and Defendant, on the other hand, have had in the past or now have, related in any manner to any and all of Defendant's products, services or business affairs, or otherwise.

This release does not affect Plaintiffs' abilities to enforce the terms of this Order, including the injunction.

**B.        Releases by Class Members**

By operation of this Order and Judgment, Settlement Class Members shall have unconditionally, completely, and irrevocably released and discharged the Released Parties from any and all claims, liens, demands, actions, causes of action, rights, duties, obligations, damages or liabilities of any nature whatsoever, whether legal or equitable or otherwise, known or unknown, whether arising under any international, federal, state or local statute, ordinance, common law, regulation, principle of equity or otherwise, that were, or could have been, asserted in the Litigation and that arise out of or relate to the Allegations, or to any similar allegations or claims that could have been asserted in the Action regarding the labeling, advertising, or formulation of the Products during the Class Period (the "Released Claims"), except that there shall be no release of claims for personal injury allegedly arising out of use of the Products. Settlement Class Members shall be forever barred from initiating, maintaining, or prosecuting any Released Claims against Released Parties.

This release does not affect class members' abilities to enforce the terms of this Order, including the injunction.

[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND JUDGMENT

### C.      Waiver of Provisions of California Civil Code § 1542.

By operation of this Order and Judgment, with respect to the released claims set forth above, Plaintiffs, Defendant, and Settlement Class Members shall be deemed to have waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits conferred by any law of any state of the United States, or principle of common law or otherwise, which is similar, comparable, or equivalent to section 1542 of the California Civil Code, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Plaintiffs, Defendant and Settlement Class Members understand and acknowledge the significance of these waivers of California Civil Code section 1542 and any other applicable federal or state statute, case law, rule or regulation relating to limitations on releases.

### D.      Other Effects of This Order

No action taken by the Parties, either previously or in connection with the negotiations or proceedings connected with the Settlement Agreement, shall be deemed or construed to be an admission of the truth or falsity of any claims or defenses heretofore made or an acknowledgment or admission by any Party of any fault, liability or wrongdoing of any kind whatsoever to any other Party. Neither the Settlement Agreement nor any act performed or document executed pursuant to or in furtherance of the settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any claim made by the Class Members or Class Counsel, or of any wrongdoing or liability of the persons or entities released under this Order and Judgment and the Settlement Agreement, or (b) is or may be deemed to be, or may be used as an admission of, or evidence of, any fault or omission of any of the persons or entities released under this Order and Judgment and the Settlement Agreement, in any proceeding in any court, administrative agency, or other tribunal. Defendant's agreement not to oppose the entry of this Order and Judgment shall not be construed as an admission or concession by Defendant that class certification was appropriate in the Litigation or would be appropriate in any other action.

1    Except as provided in this Order, Plaintiffs shall take nothing against Defendant by their
2    Complaint. This order shall constitute a final judgment binding the Parties and Class Members
3    with respect to this Litigation.

4    The Litigation is hereby dismissed on the merits and with prejudice and final judgment shall
5    be entered thereon, as set forth in this Order.

6    Without affecting the finality of the judgment hereby entered, the Court reserves
7    jurisdiction over the implementation of the Settlement Agreement. In the event the Effective Date
8    does not occur in accordance with the terms of the Settlement Agreement, then this Order and any
9    judgment entered thereon shall be rendered null and void and shall be vacated, and in such event,
10   all orders and judgments entered and releases delivered in connection herewith shall be null and
11   void and the Parties shall be returned to their respective positions *ex ante*.

12   Without further order of the Court, the parties may agree to reasonable extensions of time to
13   carry out any provisions of the Settlement Agreement.

14   There is no just reason for delay in the entry of this Judgment, and immediate entry by the
15   Clerk of the Court is expressly directed.

16   **IT IS SO ORDERED** this  3rd  day of ___October___, 2019.

17

18

19

20                              HON. EDWARD J. DAVILA
                                UNITED STATES DISTRICT JUDGE
21

22

23

24

25

26

27

28

[PROPOSED] ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT
AND JUDGMENT

11412488v.1